Ernest YOUNG, Jr., Plaintiff,

v.

Thomas E. WHITE, Secretary of the Army, Defendant.

Case No. 00–2544–JWL.

United States District Court, D. Kansas.

April 30, 2002.

---

Barry R. Grissom, Overland Park, KS, Pearson E. Dubar, Overland Park, KS, Brian J. Klopfenstein, Klopfenstein Law Firm, Kearney, MO, for Plaintiff.

Christopher Allman, Office of United States Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Plaintiff filed suit against his employer alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The matter is presently before the court on defendant's motion to dismiss or, in the alternative, for summary judgment (doc. # 35). As set forth in more detail below, defendant's motion is granted and plaintiff's complaint is dismissed in its entirety.

## I. Facts

Plaintiff Ernest Young, an African–American male, served in the Army for twenty years and reached the rank of Lt. Colonel prior to his retirement. In 1993, plaintiff began his civilian employment at Requirements Documentation Directorate (RDD) with duty at Fort Leavenworth and has been continuously employed by the Army since that time. The mission of RDD is to manage the Army's organizational requirements documentation program and RDD develops all Army organizational requirements documents—documents that are central to and prescribe the way the Army is organized and equipped. RDD also provides force development support to the Army, develops and maintains related automated databases and applications, and trains Army personnel on documentation processes and procedures. Presently, RDD is organized into three divisions. Two of these divisions (the Program Management Division and the Combat/Combat Support Documentation Division) are located at Fort Leavenworth, Kansas and the other division (Combat Service Support Documentation Division) is located at Fort Lee, Virginia. Each division is made up of subordinate branches. RDD is headquartered at Fort Leavenworth.

*Overview of Plaintiff's Claims*

In August 1997, Colonel Roger Spickelmier, a Caucasian, became acting director of the RDD with duty at the Pentagon in Washington, D.C. After becoming the acting director, Colonel Spickelmier reorganized RDD and, as a result, plaintiff was assigned to a branch chief position, a position he held from approximately August 1997 through August 1999. In October 1997, an opening became available for the position of division chief of the documentation division housed at Fort Leavenworth.

The position included the additional role of deputy director. Eight persons, including plaintiff, sought the position. Based on the recommendation of a three-person panel, Colonel Spickelmier selected Ray Lowery, a Caucasian, for the position. In November 1997, plaintiff filed a formal complaint of discrimination against Colonel Spickelmier alleging that he was denied the promotion based on his race.[1]

In February 1998, Colonel Spickelmier became the director of RDD. and transferred to Fort Leavenworth. According to plaintiff, soon after Colonel Spickelmier relocated to Fort Leavenworth, he began to retaliate against plaintiff for filing the discrimination complaint and continued to discriminate against plaintiff on the basis of his race. Plaintiff was not subject to demotion or discharge. In fact, Colonel Spickelmier selected plaintiff for promotion to a division chief position in August 1999—the highest civilian position within RDD at Fort Leavenworth and a position that plaintiff still holds today. Rather, plaintiff contends that Colonel Spickelmier, on the basis of plaintiff's race and/or in retaliation for plaintiff's EEO complaint, wrongfully denied plaintiff the authority and support commensurate with his job responsibilities; subjected plaintiff to special rules created after his promotion to the division chief position; wrongfully bypassed plaintiff when matters arose concerning plaintiff's subordinates; and constantly and continuously humiliated and harassed plaintiff.

Plaintiff does not allege that any other Army employee discriminated or retaliated against him. Moreover, with respect to his race claims concerning Colonel Spickelmier, plaintiff is not aware of any occasion when Colonel Spickelmier has used a racial epithet, told a racial joke, or made any race-based remark whatsoever.

*Colonel Spickelmier's Actions Prior to Plaintiff's August 1999 Promotion*

Although plaintiff contends that Colonel Spickelmier's "constant" harassment of him began in February 1998, plaintiff directs the court to only two specific instances of alleged harassment between February 1998 and his promotion in August 1999. In the Spring of 1998, Colonel Spickelmier approved the recommendation of Ray Lowery to select one of plaintiff's subordinate employees, Linda Morgan, to serve on a special project. Colonel Spickelmier did not discuss the matter with plaintiff until after he approved Lowery's recommendation. Plaintiff did not object to the selection of Ms. Morgan, but contends that he believed Colonel Spickelmier "wrongfully bypassed" plaintiff in retaliation for plaintiff's November 1997 complaint. It is undisputed, however, that Colonel Spickelmier has the prerogative to task directly plaintiff's subordinates.

The next incident set forth by plaintiff occurred in July 1998. At that time, Colonel Spickelmier criticized plaintiff for taking disciplinary action against Major Cheryl Miller, an employee under plaintiff's direct supervision. While Colonel Spickelmier upheld plaintiff's disciplinary action against Major Miller, he advised plaintiff that Major Miller was not the only employee complaining about unfair treatment from plaintiff. Although plaintiff concedes that Colonel Spickelmier expressed concern about receiving complaints from plaintiff's subordinates regarding "unfair treatment," plaintiff alleges that Colonel Spickelmier's criticism was baseless and evidence of a "pattern of harassment" against him.

---

1. Plaintiff has expressly abandoned any claim concerning his nonpromotion in. November 1997.

*Plaintiff's Promotion to Division Chief*

In the Summer of 1999, Colonel Spickelmier selected Mr. Lowery for the division chief position at Fort Lee and announced a recruitment action to fill Mr. Lowery's division chief position at Fort Leavenworth. Mr. Lowery, however, retained his deputy director functions despite his relocation to Fort Lee. According to Colonel Spickelmier, it was logical and beneficial to the Army to have Mr. Lowery continue to serve as the deputy director despite his relocation because Mr. Lowery had served effectively in the position and because it provided better supervision of RDD's remote location at Fort Lee. Plaintiff offers no evidence to controvert these facts. He alleges in conclusory fashion, however, that "the justification for having a Deputy Director at Fort Lee, VA for the first time ... was not logical to Plaintiff and gave credence to his belief that these actions were motivated by discriminatory animus towards him."

In August 1999, Colonel Spickelmier selected plaintiff for the division chief position left vacant by Mr. Lowery's relocation. Plaintiff alleges in his papers that Colonel Spickelmier selected plaintiff for this promotion with the expectation that plaintiff would withdraw his pending EEO claim concerning the initial selection of Mr. Lowery back in October 1997 and that when plaintiff did not withdraw his complaint, Colonel Spickelmier retaliated against plaintiff. The only evidence, however, that plaintiff offers to support this contention is an affidavit obtained by the Army in connection with an internal investigation of the ongoing conflict between Colonel Spickelmier and plaintiff. *See infra* p. 13–14. The affidavit was provided by Richard Grant, a branch chief in RDD. In the affidavit, Richard Grant speculates on the source of the conflict between Colonel Spickelmier and plaintiff:

I believe that a personality conflict exists between Mr. Young and COL Spickelmier. The causes are not clear to me, however I do believe and it is the perception of some of my peers, that the conflict stems from COL Spickelmier's expectation that Mr. Young would drop his long standing lawsuit against the Army when COL Spickelmier promoted Mr. Young to GS–15. When this did not happen, I believed that COL Spickelmier was unhappy with Mr. Young. The result was a perceptible tension between the two.

In any event, this promotion made plaintiff the highest ranking civilian employee at RDD Leavenworth.

*Colonel Spickelmier's Actions in 1999 After Plaintiff's Promotion to Division Chief*

Plaintiff's promotion became effective on August 15, 1999. At that time, plaintiff's office was relocated to the division chief's office. This was the second of three office moves about which plaintiff complains. The first office move occurred in November 1997—while Colonel Spickelmier was still at the Pentagon. It is uncontroverted that the office move in November 1997 was necessitated by a reorganization of several floors in the building in which RDD was housed. Indeed, numerous employees were affected by the reorganization in terms of moving offices. It is also uncontroverted that in November 1997, plaintiff was moved to an office specifically built for him in the midst of his branch. The second office move, occurring at the time of his promotion, directly related to his promotion—he was moved to the division chief's office. Plaintiff, however, contends that this move was not "necessary" to his promotion. Toward the end of 1999, plaintiff's office was moved a third time when he and the division chief (Lt. Colonel Melton) of the newly formed Program Management Division, *see infra* p. 10, traded

offices to bring each manager in closer proximity with the personnel each supervised. Plaintiff does not dispute that this move brought him closer to his subordinates. According to plaintiff, however, having his office moved three times resulted in a loss of "professional standing" and constituted harassment by Colonel Spickelmier.

Plaintiff's first major action as a division chief was to establish performance objectives for his subordinate branch chiefs. These performance objectives are set forth in a document called a "support form." With respect to developing these support forms, Colonel Spickelmier directed plaintiff to work with Mr. Lowery, the division chief at Fort Lee, to develop and implement a standard set of support forms for use across the directorate. According to Colonel Spickelmier, this was done in the hopes of providing uniform and improved performance objectives for all branch chiefs. Plaintiff does not dispute this fact. Rather, he contends that because a standard set of forms was not required prior to his becoming a division chief, Colonel Spickelmier's decision to have standard forms is another example of Colonel Spickelmier's efforts to harass and humiliate plaintiff. According to plaintiff, he felt "belittled in the eyes of [his] subordinates that [he] could not complete their support form without waiting for cooperation from the other Division Chief." In any event, Colonel Spickelmier ultimately supported or acquiesced to plaintiff's proposed version of the support forms.

In September 1999, Colonel Spickelmier was absent for three days. After learning that plaintiff would be out of town at a conference for at least one of the days of his absence, Colonel Spickelmier appointed Lt. Colonel Melton to be in charge for two days of his absence and put plaintiff in charge for one day of his absence. According to Colonel Spickelmier, at that time he considered Lt. Colonel Melton and plaintiff to be of comparable positional authority, and so he rotated the position of "who's in charge" between the two of them. According to plaintiff, Colonel Spickelmier's actions are evidence of race discrimination and/or retaliation because his predecessor, Mr. Lowery (a Caucasian who had not filed a complaint against Colonel Spickelmier), was always left in charge during Colonel Spickelmier's absence. As the Army points out, however, it is undisputed that Mr. Lowery was the deputy director at the same time that he served as division chief. Mr. Lowery, of course, retained that role. Thus, plaintiff assumed Mr. Lowery's functions and title of the division chief position but not the deputy director position.

Later that month, plaintiff informed Colonel Spickelmier that plaintiff's son had been murdered. Colonel Spickelmier told plaintiff to take as much time as he needed to deal with the situation. Near the time of the death of plaintiff's son, Colonel Spickelmier orally reprimanded plaintiff in regard to a business matter in the presence of other RDD employees. It is, undisputed that Colonel Spickelmier did not yell at plaintiff, but simply advised plaintiff of a concern he had about a business decision that plaintiff had made. The disagreement had nothing to do with the death of plaintiff's son. Nonetheless, plaintiff contends that a "public reprimand for a relatively minor infraction that occurred in close proximity to the death of plaintiff's son" is "another example of unnecessary and irrational harassment."

In October 1999, Colonel Spickelmier issued a written reprimand to Phillip Billard, a branch chief supervised by plaintiff. At the time of the reprimand, Mr. Billard had been complaining on a regular basis about plaintiff's leadership and management style. In the reprimand, Colonel

Spickelmier advised Mr. Billard to cease being a disruptive influence in the organization and encouraged Mr. Billard to cooperate with plaintiff. Colonel Spickelmier also advised Mr. Billard that it was his responsibility to try to change his behavior in light of plaintiff's management style. Colonel Spickelmier handed plaintiff a copy of the written reprimand right before he handed the written reprimand to Mr. Billard. According to plaintiff, this is another example of Colonel Spickelmier wrongfully bypassing plaintiff "when matters arose concerning the subordinate employees he was selected to manage."

In that same month, Colonel Spickelmier assigned a top priority project to a branch in plaintiff's division, the maneuver branch. He assigned the project to the branch during a staff call at which plaintiff was present and no one, including plaintiff, objected to the assignment. Delores Harper, as acting branch chief for the branch at the time, was designated as the lead person on the project.[2] After the announcement, Colonel Spickelmier asked plaintiff whether he wanted to retain Ms. Harper on the project or change the lead on the project. Plaintiff responded that he did not want to change the lead on the project and that he wanted to retain Ms. Harper as the lead. According to plaintiff, Colonel Spickelmier again wrongfully bypassed plaintiff by indirectly assigning the project to Ms. Harper without informing plaintiff beforehand.

During this same time frame, plaintiff proposed a reorganization of his division. Colonel Spickelmier initially accepted plaintiff's proposal for the reorganization. After the proposal was announced, however, one of the branch chiefs approached Colonel Spickelmier and indicated that the branch chiefs did not support plaintiff's proposal. Colonel Spickelmier then talked to all of the other branch chiefs and discovered that three of the four branch chiefs disagreed with plaintiff's proposal. Although each branch chief had his or her own recommendation for reorganization, the branch chiefs as a group were able to agree on a compromise. Ultimately, Colonel Spickelmier adopted this compromise because he believed it to be the best alternative. Thereafter, he announced that he changed his position regarding the reorganization and that he was going to adopt an alternative course of action with respect to the reorganization. Plaintiff contends that Colonel Spickelmier thus wrongfully denied plaintiff the authority and support commensurate with the division chief position.

In November 1999, Colonel Spickelmier reorganized RDD again and created the Program Management Division. He selected Lt. Colonel Melton as the division chief. At that time, Colonel Spickelmier reiterated that Mr. Lowery was second-in-charge overall, that Lt. Colonel Melton would be in charge of normal day-to-day actions in the directorate, and that plaintiff would be in charge if Lt. Colonel Melton was not available. Plaintiff alleges that the reorganization "did not appear rational" to him and that Colonel Spickelmier's decision to place Lt. Colonel Melton in charge of day-to-day actions in the directorate was humiliating to plaintiff.

During this same time frame, Colonel Spickelmier issued plaintiff a written performance counseling memorandum ex-

---

**2.** Plaintiff contends in his papers that Colonel Spickelmier did not assign the project to the maneuver branch; rather, he assigned it directly to Delores Harper. Plaintiff's evidence, however, simply does not support this contention. Moreover, while plaintiff testified in his deposition that he did not "think" that Ms. Harper was the acting branch chief at the time, he offers no other evidence to support his belief that Ms. Harper was not in that position.

pressing concern regarding certain actions taken by plaintiff since his selection as division chief just three months earlier. The written reprimand was prompted in part by the fact that three of plaintiff's four branch chiefs were looking for other jobs and because of a complaint about irregularities or improper actions during a recruitment in which plaintiff was the selecting official. Plaintiff contends that this written reprimand was unwarranted because the allegations made by his subordinates were never substantiated. Plaintiff has no evidence, however, that the allegations were false or that Colonel Spickelmier otherwise fabricated the issues raised in the written reprimand. It is undisputed that Colonel Spickelmier conducted an investigation of the various complaints of plaintiff's subordinates prior to issuing the written reprimand. Moreover, plaintiff was given an opportunity to respond to the written reprimand and he declined to do so. A copy of the written reprimand was sent to the Civilian Personnel Advisory Center (CPAC) because CPAC had assisted Colonel Spickelmier in the preparation of the document. Plaintiff contends that it was unnecessary to send a copy to CPAC and cites this as another example of Colonel Spickelmier's efforts to humiliate him.

The next action taken by Colonel Spickelmier and challenged by plaintiff concerns Colonel Spickelmier's decision in November 1999 to senior rate all non-commissioned officers (NCOs) in the organization. As a result of that decision, the authority of everyone, including plaintiff and Mr. Lowery, to rate NCOs was withdrawn. Plaintiff was the first person to complain about Colonel Spickelmier's decision. According to plaintiff, his complaint was ig-

nored. Thereafter, Mr. Lowery complained about the decision and Colonel Spickelmier—within a few days of his initial decision to withdraw their authority—then reversed his decision and restored the authority of both division chiefs as senior raters for NCOs. Plaintiff contends that these facts demonstrate that Colonel Spickelmier clearly favored Mr. Lowery over him and that Colonel Spickelmier again wrongfully denied plaintiff the authority commensurate with his job responsibilities. The Army contends that Colonel Spickelmier reversed his decision because both division chiefs had disagreed with the decision.

Plaintiff next alleges that Colonel Spickelmier wrongfully denied him the authority commensurate with the division chief position by refusing to permit him to select a branch chief in his division. By way of background, in November 1999, plaintiff selected Richard Grant, a Caucasian, for a branch chief position in his division despite the fact that an independent panel recommended Leo Thomas, an African–American, as the best candidate for the position. Mr. Thomas then lodged an informal complaint with Colonel Spickelmier, alleging that plaintiff's promotion decision had been based, at least in part, on race. Colonel Spickelmier investigated Mr. Thomas's complaint concerning irregularities in the selection process and concluded that the complaint was substantiated.[3] While Colonel Spickelmier approved the promotion of Mr. Grant, he withheld plaintiff's authority to make the selection for the next open branch chief position and advised Mr. Thomas that he would accept the recommendation of the selection panel with respect to the next branch chief position. A properly constituted selection panel collec-

---

**3.** Plaintiff contends in his papers that the investigation was unfair because he was not given an opportunity to respond. Plaintiff's evidence, however, does not support this con-

tention. Moreover, Colonel Spickelmier testified that he discussed the matter with plaintiff.

tively recommended Mr. Thomas as the best candidate for the next vacancy. Colonel Spickelmier accepted that recommendation and selected Mr. Thomas for the position. Thereafter, Colonel Spickelmier announced to the leadership of RDD that he had made the selection for the branch chief in plaintiff's division. Plaintiff contends that these acts caused him extreme humiliation and embarrassment.

In December 1999, plaintiff sent to Brigadier General (BG) Odierno, Colonel Spickelmier's direct supervisor, a memorandum outlining his concerns about Colonel Spickelmier's treatment of him and requesting assistance from BG Odierno. BG Odierno approached Colonel Spickelmier about plaintiff's concerns and Colonel Spickelmier recommended that BG Odierno initiate an independent investigation under the provisions of Army Regulation (AR) 15–6. While plaintiff criticizes Colonel Spickelmier for recommending this investigation when plaintiff's claims were already being investigated through the Army's EEO office, plaintiff concedes that he is the one who initially approached BG Odierno to request assistance. It is further undisputed that BG Odierno would have initiated the investigation based on plaintiff's request for assistance regardless of Colonel Spickelmier's recommendation. In fact, on his own initiative, BG Odierno ordered an AR 15–6 investigation not only of the conflict between plaintiff and Colonel Spickelmier but of the entire climate of RDD.[4] To quell rumors and to let everyone at RDD know what was going on, Colonel Spickelmier made a public announcement to the leadership in the directorate that he and plaintiff had had disagreements and

that Colonel Spickelmier had requested an AR 15–6 investigation. Plaintiff was humiliated by this announcement.

Finally, in December 1999, Colonel Spickelmier asked plaintiff to stop by his office daily to report ongoing events and to encourage personal interaction. At the time of Colonel Spickelmier's request, both Mssrs. Lowery and Melton (the two other division chiefs) were checking in every day with Colonel Spickelmier to report ongoing events in RDD. According to Colonel Spickelmier, he believed that as the director of RDD it was entirely appropriate to meet, if possible, each day with his division chiefs to discuss events relevant to the effective operation of RDD. While Lt. Colonel Melton was stopping by Colonel Spickelmier's office each day, Mr. Lowery was checking in by telephone given his remote location in Fort Lee. Plaintiff alleges that because Mr. Lowery was permitted to check in via telephone, he should have been permitted to check in via electronic mail or telephone. According to plaintiff, daily in-person meetings with Colonel Spickelmier served no purpose "except to show everyone that [Colonel Spickelmier] has the power to make plaintiff do so, which is humiliating."

*Colonel Spickelmier's Actions in 2000 and Plaintiff's Mid–Point Counseling*

In January 2000, Colonel Spickelmier considered, but did not accept, plaintiff's recommendation to have division chiefs teach to their branch chiefs a military training course on the prevention of sexual harassment of homosexual persons. Because Colonel Spickelmier considered the training on homosexual persons in the mili-

---

4. BG Odierno testified that the interim AR 15–6 report indicated that plaintiff "was the individual who was causing a lot of the command climate problems within the directorate." Before the investigation was completed, however, BG Odierno received a copy of plaintiff's complaint in this case naming him

as a defendant. BG Odierno terminated the investigation before it was completed because, based upon the interim findings, he was concerned that continuing the investigation might be viewed by plaintiff as retaliatory.

tary to be uniquely military, and because only military members were required to attend this training,[5] Colonel Spickelmier determined that it would be more appropriate for Lieutenant Colonel Melton (a military member) to provide the training to military members of the directorate. According to plaintiff, Colonel Spickelmier's decision to permit Lt. Colonel Melton to teach the course was humiliating and deprived him of the authority of the division chief position.

On January 25, 2000, plaintiff filed a formal EEO complaint against Colonel Spickelmier alleging retaliation. In that complaint, plaintiff alleged that Colonel Spickelmier repeatedly bypassed plaintiff in dealing with plaintiff's subordinates; gave plaintiff a written reprimand in November 1999 based on "gossip"; publicly scolded plaintiff in the presence of secretaries;[6] humiliated plaintiff by supporting his subordinates when plaintiff's subordinates disagreed with plaintiff concerning the division reorganization in October 1999; failed to provide plaintiff with reasonable and measurable performance objectives; failed to provide authority and support commensurate with his position as division chief; and created special rules for the division chief position after he became division chief. On February 11, 2000, plaintiff filed another formal EEO complaint against Colonel Spickelmier alleging retaliation. This complaint alleged that Colonel Spickelmier bypassed plaintiff and withdrew his authority to select a branch chief and that Colonel Spickelmier made a public announcement to RDD leadership that he had made the selection.

While plaintiff filed only three formal EEO complaints (November 1997; Janu-

ary 2000; February 2000), it appears from other evidence in the record that he informally visited with an EEO counselor in November 1999 and December 1999. Moreover, the record suggests that there was some type of ongoing EEO investigation concerning the relationship between plaintiff and Colonel Spickelmier of which Colonel Spickelmier was aware at least by November 1999. It is unclear, however, whether this investigation was a new investigation commenced in November 1999 as a result of plaintiff's informal discussion with an EEO counselor or whether there was an ongoing investigation of plaintiff's initial formal complaint in November 1997.

During this same time frame, another "incident" occurred about which plaintiff now complains. Specifically, in January 2000, Colonel Spickelmier, consistent with his authority, had finalized the wording on plaintiff's support form (the document detailing plaintiff's performance objectives) for the upcoming year. Plaintiff asked Colonel Spickelmier for a hard copy of his support form and Colonel Spickelmier provided the copy through the office mail distribution system. While the nature of plaintiff's complaint is unclear, he states in his papers that "the hard copy was mailed through distribution inn spite [sic] of the fact Plaintiff had been ordered to physically report to Colonel Spickelmier's office daily."

On February 22, 2000, Colonel Spickelmier went on vacation. He left Lt. Colonel Melton in charge during his absence, which, according to plaintiff, undermined plaintiff's authority and humiliated him. The next action about which plaintiff complains occurred in early March 2000. On

---

5. Plaintiff maintains that at the time he rejected plaintiff's recommendation, Colonel Spickelmier did not know that the training was for military personnel only. Plaintiff's evidence, however, does not support this allegation.

6. This allegation refers to the instance when Colonel Spickelmier reprimanded plaintiff near the time of the death of plaintiff's son.

March 2, 2000, Colonel Spickelmier held a planning meeting in his office to prepare for BG Odierno's upcoming visit. Plaintiff was not invited to attend the meeting until he stopped by Colonel Spickelmier's office (for his required daily visit) and discovered that the meeting was already in progress. Only then did Colonel Spickelmier invite plaintiff to join the meeting. Plaintiff was humiliated by Colonel Spickelmier's conduct. The next day, Colonel Spickelmier approved having two briefers from plaintiff's division for BG Odierno's visit, unaware that plaintiff had directed one briefer for the visit. Colonel Spickelmier thought that two briefers would be more effective than one to explain the past and present means of doing a specific task. Plaintiff contends that Colonel Spickelmier undermined plaintiff's authority and humiliated him by adding a briefer for BG Odierno's visit.

At the end of March 2000, plaintiff had occasion to be out of town on other duties. Prior to leaving the office, plaintiff directed that a subordinate in Mr. Billard's branch attend an April 3, 2000 meeting. After plaintiff had gone out of town, Colonel Spickelmier became aware of additional information demonstrating the significance of the meeting and, thus, the need for Mr. Billard, as branch chief, to attend the meeting instead of a subordinate. Colonel Spickelmier directed Mr. Billard to attend the meeting while plaintiff was out of town. Plaintiff maintains that Colonel Spickelmier's action undermined his authority and humiliated him.

In the middle of April 2000, after considering plaintiff's comments and suggestions, Colonel Spickelmier announced to the directorate that he had made the selection for the leaders of two top projects from plaintiff's division. Because the announcement revealed that plaintiff had not selected the leaders for the projects, plaintiff felt humiliated and embarrassed. At the end of that month, Colonel Spickelmier assigned Lt. Colonel Melton the task of developing a civilian personnel policy on GS–11 promotions. Plaintiff contends that this decision undermined his authority as the task had previously been assigned to the senior civilian who, at that time, was plaintiff. It is undisputed, however, that in the meantime Colonel Spickelmier had created the Program Management Division (PMD), that Lt. Colonel Melton was the division chief of PMD, and that PMD was responsible for personnel administration within the directorate. Consequently, Colonel Spickelmier believed that Lt. Colonel Melton was the person best suited to develop the policy.

In May 2000, plaintiff received his mid-point counseling from Colonel Spickelmier. A supervisor performs a mid-point counseling of each subordinate employee to apprise that employee of the supervisor's evaluation of the employee's performance thus far during the year. The evaluation is used only for purposes of information for the employee being counseled. The evaluation does not become part of the employee's year-end evaluation and it is not kept as part of that employee's permanent personnel file.

As part of plaintiff's mid-point counseling, Colonel Spickelmier gave plaintiff a "satisfactory" rating for the performance objective "Provide organizational management and leadership within Division." Colonel Spickelmier indicated specific concerns with respect to two subcategories of this performance objective. With respect to the subcategory "Adhere to and support Army values," Colonel Spickelmier wrote the following sentence: "Need improvement on organizational loyalty." In explaining this comment to plaintiff, Colonel Spickelmier told plaintiff that it was his belief that plaintiff was improperly attempting to use and manipulate the EEO

system by filing unfounded complaints of discrimination and retaliation and that plaintiff's frivolous challenges to every decision that Colonel Spickelmier made were undermining the effectiveness and morale of RDD.

A month later, on June 16, 2000, Colonel Spickelmier—based on the advice of legal counsel and in an effort to "permit the EEO system to work"—withdrew the written comment concerning organizational loyalty and retracted his comments concerning plaintiff's manipulation of the EEO process. Two weeks later, the Office of Complaint Investigations (OCI) for the Department of Defense issued a memorandum recommending a "finding of discrimination based on reprisal" with respect to plaintiff's mid-point counseling.[7] Specifically, OCI concluded that the handwritten note concerning organizational loyalty, coupled with Colonel Spickelmier's comments to plaintiff during the counseling session, "would reasonably be likely to serve to have a chilling effect on the Complainant's effort to pursue those claims and interfere in the EEO process." The effect of OCI's finding is unclear from the record.

In July 2000, plaintiff received his final evaluation for the year 2000. Colonel Spickelmier evaluated plaintiff as "excellent" in six of eight major performance objectives. He received a "satisfactory" rating in the areas of "organizational management and planning" (reflecting a continuing concern regarding plaintiff's subordinates' complaints about plaintiff's management style) and "implementing special operations forces documentation" (reflecting plaintiff's satisfactory, though not exceptional, progress on integrating Special Operating Forces).

Around the same time that he received his final evaluation, plaintiff was preparing his final annual evaluation of Leo Thomas, the African–American male whom Colonel Spickelmier had selected for a branch chief position in plaintiff's division. In that regard, plaintiff and Colonel Spickelmier had exchanged comments regarding their respective evaluations of Mr. Thomas's performance. Colonel Spickelmier disagreed with certain aspects of plaintiff's proposed evaluation of Mr. Thomas and ultimately changed plaintiff's performance evaluation of Mr. Thomas to Mr. Thomas's benefit. Colonel Spickelmier averred that in his opinion plaintiff's evaluation of Mr. Thomas was overly critical and without substantiation. Plaintiff, of course, did not believe that his evaluation was overly critical or without substantiation. Nonetheless, it is undisputed that Colonel Spickelmier, as Mr. Thomas's second line supervisor, is permitted by policy and regulation to make changes to Mr. Thomas's performance evaluation if he disagrees with the rater.

In August 2000, Fort Leavenworth CPAC identified additional comments required on the branch chief support forms and, thus, the forms were being redrafted. Colonel Spickelmier used this opportunity to readdress with the division chiefs certain aspects of the forms with which he did not completely agree. Plaintiff perceived this as Colonel Spickelmier "failing to approve" plaintiff's support forms and, thus, undermining plaintiff's authority. It is undisputed, however, that Colonel Spickelmier incorporated most of plaintiff's recommendations and suggestions for the new support forms.

---

**7.** OCI recommended a finding of no discrimination on all remaining issues, including the issues raised by plaintiff in this lawsuit.

*Remaining Issues*

Plaintiff raises no more issues regarding events or actions occurring in the year 2000 and the remainder of that year apparently passed without incident. Moreover, with respect to 2001, plaintiff complains only that Colonel Spickelmier, in July 2001, again changed plaintiff's performance evaluation of Leo Thomas. With respect to his own performance evaluation for 2001, plaintiff received from Colonel Spickelmier an "excellent" rating in all eight major performance objectives. Colonel Spickelmier retired from active duty on January 31, 2002.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams*, 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

In the pretrial order, plaintiff alleges that each and every one of the actions taken by Colonel Spickelmier and described above were based on plaintiff's race and that, taken together, the actions establish a pattern of racial harassment.[8] He also argues that each of the acts constitutes an act of retaliation by Colonel Spickelmier and that, taken together, they establish a pattern of retaliatory harassment. As plaintiff has no direct evidence of discrimination or retaliation,[9] the court analyzes plaintiff's claims under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). With respect to each of his claims, plaintiff must demonstrate, *inter alia,* that he suffered an adverse employment action. *See O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1252 (10th Cir.2001) (retaliation); *Trujillo v. University of Colo. Health Sciences Ctr.,* 157 F.3d 1211, 1215 (10th Cir.1998) (race discrimination). As described below, and as argued by defendant in its papers, plaintiff has not presented evidence that any of the acts about which he complains rises to the level of an "adverse employment action" for purposes of Title VII liability. For this reason, summary judgment is granted in favor of defendant.[10]

The Supreme Court has explained that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Although the Tenth Circuit liberally defines "adverse employment action," the Circuit nonetheless takes a takes a case-by-case approach in determining whether a given action is "adverse" and examines the unique factors relevant to

---

8. During his deposition, plaintiff expressly abandoned his race claims after discussing the issue with his counsel. At some point thereafter, plaintiff "changed his position" (apparently without advising defendant) and set forth his race claims in the pretrial order despite the fact that defendant conducted no discovery on those claims in light of plaintiff's agreement to abandon the claims. In its motion for summary judgment, defendant urges the court to hold plaintiff to his agreement and grant summary judgment on the race claims in light of that express agreement. The court declines to address further this argument because it concludes that plaintiff's race claims fail in any event on the merits.

9. Plaintiff contends that the mid-point counseling is direct evidence of retaliation and, thus, he is entitled to a jury trial. The court disagrees. While the mid-point counseling may be direct evidence of a causal connection between plaintiff's protected activity and any adverse action that Colonel Spickelmier might have taken, the fact remains that Colonel Spickelmier did not take any adverse action against plaintiff. *See infra* p. 32–33. Thus, the mid-point counseling is not "direct evidence" of retaliation itself as it does not establish that plaintiff suffered an adverse employment action as a result of engaging in protected activity. *See Stone v. City of Indianapolis Public Utilities Div.,* 281 F.3d 640, 644 (7th Cir.2002) (for plaintiff to obtain/prevent summary judgment in retaliation case using direct evidence, evidence must establish that plaintiff engaged in protected activity and as a result suffered the adverse employment action of which he complains); *see also Apgar v. State of Wyoming,* No. 99–8029, 2000 WL 1059444, at *10 (10th Cir. Aug.2, 2000) (analyzing retaliation claim under McDonnell Douglas framework despite fact that plaintiff had "direct evidence" of a causal connection).

10. In its papers, defendant also contends that summary judgment is appropriate on several of plaintiff's claims because plaintiff failed to exhaust his administrative remedies with respect to those claims. The court declines to address this argument in light of its conclusion that all of plaintiff's claims fail on the merits.

the situation at hand. *See Jeffries v. Kansas,* 147 F.3d 1220, 1231–32 (10th Cir. 1998). Bearing this standard in mind, the court concludes that summary judgment in favor of defendant is warranted as no reasonable jury could find that plaintiff suffered any adverse employment action.

The specific acts challenged by plaintiff generally can be grouped into one of several categories—instances in which Colonel Spickelmier directly tasked or reprimanded one of plaintiff's subordinates; those in which Colonel Spickelmier tasked his direct reports, including plaintiff; those in which Colonel Spickelmier reasonably exercised his authority as the director of RDD with respect to business-related decisions; those in which Colonel Spickelmier reprimanded plaintiff; those in which Colonel Spickelmier allegedly humiliated plaintiff in public; and those in which plaintiff was inconvenienced. As will be described below, however, none of these acts fall within the category of "adverse employment actions." Simply put, plaintiff has presented no evidence that any tangible job consequence accompanied any of Colonel Spickelmier's actions. There is no evidence that Colonel Spickelmier "undermined" plaintiff's authority and not the authority of the other division chiefs. Even taken in the aggregate, there is no evidence whatsoever that plaintiff's authority was undermined with such regularity that it became difficult for plaintiff to assert his authority with respect to his subordinates or that it was otherwise difficult for plaintiff to perform the functions of his job. Similarly, there is no evidence that Colonel Spickelmier's conduct was so frequent or pervasive as to strip plaintiff of his responsibilities. In fact, while plaintiff complains about a large number of instances, considering that the instances span the course of more than three years and considering that plaintiff and Colonel Spickelmier worked together on a daily basis for that time period, it is clear that the vast majority of time plaintiff was able to complete his tasks and responsibilities as division chief without interference from Colonel Spickelmier.

In the end, then, the evidence viewed in the light most favorable to plaintiff shows only that plaintiff was distressed over Colonel Spickelmier's allegedly disagreeable conduct. This distress, in the absence of evidence that the conduct affected plaintiff's employment status, is not enough for plaintiff's claims to get to a jury. *See Sanchez v. Denver Public Schools,* 164 F.3d 527, 533 (10th Cir.1998) ("Although we appreciate Ms. Sanchez's distress over Ms. Aandhal's alleged disagreeable conduct, that conduct did not significantly affect her employment status and therefore did not constitute adverse employment action remediable under Title VII."). In short, absent some evidence that plaintiff's job was negatively impacted by Colonel Spickelmier's conduct, the court believes that the Circuit would decline to expand the scope of adverse employment action to include the types of actions challenged by plaintiff in this case.

The court begins its analysis by looking at those instances in which Colonel Spickelmier assigned work directly to plaintiff's subordinates or reprimanded one of plaintiff's subordinates and, in essence, bypassed plaintiff in doing so. Plaintiff criticizes, for example, Colonel Spickelmier's selection, without input from plaintiff, of Linda Morgan for a special project and the Colonel's decision to assign a project to Delores Harper. He also criticizes the Colonel's directing Phillip Billard to attend a certain meeting. It is uncontroverted, however, that Colonel Spickelmier has the prerogative to task directly any of the subordinates of any of his managers at any time he chooses. While plaintiff might disagree with the tasks that are assigned or with the decision to give certain tasks to

certain individuals, his criticism of the way in which Colonel Spickelmier exercises his authority does not render that exercise an adverse employment action against plaintiff. Moreover, there is no evidence that Colonel Spickelmier bypassed plaintiff but not other division chiefs. Similarly, there is no evidence that Colonel Spickelmier's conduct altered plaintiff's employment status in any way or had any negative effect on plaintiff's standing within the organization. Likewise, while Colonel Spickelmier gave a written reprimand to Mr. Billard, it was entirely within his discretion to do so. Again, there is no evidence that Colonel Spickelmier chose to reprimand directly plaintiff's subordinates but not the subordinates of other division chiefs. In the absence of any evidence that the proper exercise of Colonel Spickelmier's authority resulted in a tangible detriment to plaintiff's employment, these instances do not constitute adverse actions for purposes of Title VII.

Plaintiff similarly criticizes the Colonel's tasking of his own direct reports, including plaintiff. For example, plaintiff claims that he was humiliated when the Colonel selected Lt. Colonel Melton to develop a civilian personnel policy. There is no evidence that the selection of Lt. Colonel Melton was inappropriate or outside the proper scope of Colonel Spickelmier's authority. Plaintiff also claims that he was humiliated when he was told by the Colonel to work with Mr. Lowery on standardized support forms. There is no evidence, however, that the Colonel's directive was anything other than a perfectly appropriate business request and a request that was undisputedly within the Colonel's discretion to make. The record is also devoid of any evidence suggesting that the directive negatively impacted plaintiff's employment in any way.

Plaintiff also complains about a host of instances in which Colonel Spickelmier exercised his authority as the director of RDD in the context of certain business decisions. These instances include Colonel Spickelmier's decision to leave Lt. Colonel Melton in charge during Colonel Spickelmier's absence, subsequently selecting Lt. Colonel Melton as the third division chief, placing Lt. Colonel Melton in charge of day-to-day activities, and asking him to teach the sexual harassment training course. While plaintiff may genuinely believe that these acts served to undermine plaintiff's own authority, it is uncontroverted that each of these acts was a proper exercise of Colonel Spickelmier's authority as the director of RDD. Moreover, there is no evidence that the advancement of Lt. Colonel Melton in any way affected plaintiff's employment status—he remained a division chief, the highest civilian position in RDD.

It is also uncontroverted, for example, that Colonel Spickelmier had the authority to change Leo Thomas's performance evaluations. Plaintiff has no evidence that Colonel Spickelmier's changes to those evaluations were irrational or unsubstantiated. He simply disagreed with the Colonel's evaluation of Leo Thomas and was allegedly humiliated by the Colonel's decision to exercise his discretion and change the evaluation. Again, there is no evidence before the court suggesting that Colonel Spickelmier's modification of the performance evaluations had any adverse effect on plaintiff's employment status and no reasonable jury could conclude that the Colonel's conduct had an adverse effect on any term of plaintiff's employment because it is beyond dispute that Colonel Spickelmier, as plaintiff's supervisor and director of RDD, had the authority to change a subordinate's performance evaluation.

Colonel Spickelmier also exercised his authority as director of RDD when he decided to have two briefers for BG Odier-

no's visit. In doing so, he disagreed with plaintiff's conclusion that only one briefer was necessary. But there is simply no evidence that the Colonel's decision was unreasonable or beyond the bounds of his authority as director. There is also no evidence that the Colonel did not honestly believe that two briefers were required. Stated another way, there is simply no evidence that the Colonel decided to use two briefers just to undermine plaintiff's authority or for the purpose of humiliating plaintiff. Similarly, while Colonel Spickelmier "overruled" plaintiff's proposal concerning the reorganization of the division, it is undisputed that the final decision concerning the reorganization properly lay with Colonel Spickelmier. Moreover, there is no evidence suggesting that these judgment calls were not the types of decisions routinely made by Colonel Spickelmier in the course of his employment.

It is also beyond dispute, of course, that some of Colonel Spickelmier's decisions had the effect of taking certain responsibilities away from plaintiff. For example, Colonel Spickelmier's decision to senior rate NCOs and his decision to select Leo Thomas for the vacant branch chief position in plaintiff's division meant that plaintiff could no longer senior rate NCOs and could not select the branch chief. These decisions, however, were well within Colonel Spickelmier's authority. Moreover, the Circuit has held that an alteration of job responsibilities does not constitute an adverse employment action. *See Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir.1998) ("we will not consider ... an alteration of job responsibilities to be an adverse employment action"); *accord Aquilino v. University of Kansas*, 268 F.3d 930, 934 (10th Cir.2001) (assistant professor's removal from dissertation com-

mittee merely altered her job responsibilities by eliminating this particular assignment in her last months of employment and, as such, did not constitute an adverse employment action).

Another category of actions set forth by plaintiff in support of his claims are instances in which he was reprimanded by Colonel Spickelmier. It is beyond dispute that the two oral reprimands that plaintiff received from Colonel Spickelmier—one concerning plaintiff's discipline of Cheryl Miller and unfair treatment in general and the other concerning a business issue near the time of the death of plaintiff's son—do not constitute adverse actions as these reprimands had no effect on plaintiff's employment with defendant. *See Sanchez*, 164 F.3d at 533 (unsubstantiated oral reprimands are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status); *accord Johnson v. E.A. Miller, Inc.*, No. 97–4200, 1999 WL 94827, at *2 (10th Cir. Feb.25, 1999) (notwithstanding Circuit's liberal definition of "adverse employment action," meeting with management at which plaintiff was reprimanded does not constitute adverse employment action).[11] Similarly, with respect to plaintiff's November 1999 written reprimand, there is no evidence that this reprimand had any negative effect on his employment—indeed, plaintiff remains employed to this day as a division chief, the highest civilian position in RDD. Moreover, after receiving the written reprimand, plaintiff continued to receive solid annual performance evaluations. Thus, no reasonable jury could conclude that the written reprimand is sufficient to constitute an adverse action. *Cf. Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104

---

11. Pursuant to Tenth Circuit Rule 36.3(B)(1), the court cites this unpublished opinion for its persuasive value.

(10th Cir.1998) (written warnings constituted adverse actions where evidence demonstrated that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction).

Plaintiff's mid-point counseling, however, requires closer scrutiny. It is undisputed that Colonel Spickelmier, in explaining his written comment that plaintiff needed improvement with respect to "organizational loyalty," told plaintiff that it was his belief that plaintiff was improperly attempting to use and manipulate the EEO system by filing unfounded complaints and that plaintiff's "frivolous" challenges to Colonel Spickelmier's decisions were undermining the effectiveness and morale of RDD. While the OCI's finding of retaliation is not binding on this court, *see Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1331 (10th Cir.1999), the court agrees that the counseling document, coupled with Colonel Spickelmier's comments, and when considered in the light most favorable to plaintiff, supports the conclusion that Colonel Spickelmier's assessment of plaintiff was based on plaintiff's EEO activity. Stated another way, plaintiff's mid-point counseling would be evidence of a causal connection between plaintiff's EEO activity and any adverse actions taken by Colonel Spickelmier. *See Apgar v. State of Wyoming*, No. 99–8029, 2000 WL 1059444, at *10 (10th Cir. Aug.2, 2000) (final report concluding that plaintiff should not be considered for rehire because of "negative attitude" sufficient to support causal connection where assessment was based on plaintiff's protected activity).[12] Nonetheless, as explained in this opinion, Colonel Spickelmier did not take any adverse actions against plaintiff. Moreover, the mid-point counseling itself

is insufficient to constitute an adverse action because the evaluation did not become part of plaintiff's year-end evaluation and was not kept as part of plaintiff's permanent personnel file. In other words, the mid-point counseling had no bearing whatsoever on plaintiff's present or future job status. *Cf. id.* (final report constituted adverse action where it altered plaintiff's employment status—it had an adverse impact on future employment opportunities with defendant); *Toth v. Gates Rubber Co.*, No. 99–1017, 2000 WL 796068, at *9 (10th Cir. June 21, 2000) (negative performance evaluation was adverse action where the evaluation ultimately led to plaintiff's discharge and, thus, had adverse impact on future employment).[13]

Plaintiff also complains about a number of acts that, according to plaintiff, publicly humiliated him. For example, he challenges various "public announcements" that Colonel Spickelmier made, including the announcement concerning the AR 15–6 investigation, Colonel Spickelmier's public announcement that he selected the leaders for two top projects from plaintiff's division, and the Colonel's announcement that he selected Leo Thomas for the branch chief position. Plaintiff also complains that he suffered public humiliation when Colonel Spickelmier sent a copy of the November 1999 written reprimand to CPAC and when Colonel Spickelmier did not invite plaintiff to the planning meeting for BG Odierno's visit until plaintiff stopped by his office and the meeting was already underway.

The Tenth Circuit has attached some significance to public humiliation of a plaintiff in both harassment and retaliation cases. In *Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408 (10th Cir. 1997), for example, the plaintiff brought a

---

**12.** *See supra* note 11.

**13.** *See supra* note 11.

sexual harassment claim against the defendants based primarily on several sexually disparaging remarks directed at her, repeated frequently, and often made within earshot of her co-workers. 129 F.3d at 1411–12. On appeal, after an advisory jury returned a verdict for plaintiff and the district court. entered judgment for plaintiff and awarded damages, defendants argued that the statements made to the plaintiff over the course of her employment were neither sufficiently severe nor pervasive to create a hostile work environment. *Id.* at 1412. The Tenth Circuit upheld the district court's decision. *Id.* at 1414–15. In doing so, the Circuit, *inter alia,* examined the setting and context in which the alleged discriminatory conduct occurred. *Id.* at 1414. Specifically, the Tenth Circuit focused on the "intimate setting" of plaintiff's workplace, where plaintiff's coworkers could hear her supervisor's remarks and occasionally witness his treatment of plaintiff. *Id.* According to the court, "[t]his public setting only increased the humiliation, and, therefore, the severity of the discriminatory conduct." *Id.*

In *Berry v. Stevinson Chevrolet,* 74 F.3d 980 (10th Cir.1996), the plaintiff's former employer complained to the county sheriff's office that the plaintiff had committed forgery and theft. *Id.* at 984. The plaintiff was subsequently prosecuted for and acquitted of those crimes. *Id.* Analyzing the plaintiff's retaliation claim, the district court held that reporting the plaintiff of a suspected crime constituted an adverse employment action. *Id.* at 986. On appeal, the Circuit affirmed the district court's decision and emphasized that a "criminal trial . . . is necessarily public and therefore carries a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Id.* at 986–87 (citing *Passer v. American Chemical Soc.,* 935 F.2d 322 (D.C.Cir.1991) (holding that cancellation of benefit to honor plaintiff in retaliation for filing an age discrimination complaint constitutes adverse employment action because of public humiliation involved)).

The "public humiliation" concern set forth by the Tenth Circuit in *Northwest Financial* and *Berry* is clearly not present here. The public remarks made by Colonel Spickelmier were not degrading (other than perhaps in plaintiff's own mind) nor were the remarks made in a derogatory fashion. The remarks were not personal attacks on plaintiff. Rather, the remarks made by Colonel Spickelmier were clearly related to business developments in RDD (*i.e.,* the selection of Leo Thomas, the selection of project leaders) or a concern that affected RDD as a whole (*i.e.,* the AR 15–6 investigation). Moreover, there is no evidence that any of these "public" events, including sending a copy of plaintiff's written reprimand to CPAC and inviting plaintiff to the planning meeting after-the-fact, had any adverse effect on plaintiff's employment status (present or future) or damaged plaintiff's "reputation" in any way. In fact, the record is devoid of any evidence that plaintiff's subordinates or colleagues lost respect for plaintiff because of Colonel Spickelmier's conduct or otherwise thought less of plaintiff. In short, Colonel Spickelmier's public acts are totally different from "referring trumped-up criminal charges," *see Aquilino,* 268 F.3d at 934, or disparaging an individual based on a protected characteristic.

Finally, plaintiff challenges a handful of acts that, at most, amounted to an inconvenience to plaintiff. *See Sanchez,* 164 F.3d at 532 ("we will not consider a mere inconvenience . . . to be an adverse employment action"). These acts include plaintiff's office moves, the Colonel's directive that plaintiff stop by his office daily to report ongoing events relevant to RDD, and the fact that the Colonel sent plaintiff a hard copy of his support form through the office

mail distribution system rather than personally giving plaintiff a copy of the form during one of plaintiff's daily visits. While moving plaintiff's office three times over the course of more than two years may have been annoying to plaintiff, these moves simply do not constitute adverse employment actions, particularly as plaintiff concedes that other employees had their offices moved at the same time and that the moves were made to bring managers closer to their subordinates. . *See Heno v. Sprint/United Management Co.,* 208 F.3d 847 (10th Cir.2000) (no adverse action where plaintiff showed, *inter alia,* that her desk was moved to a different location). Similarly, while plaintiff may have felt inconvenienced by having to walk down the hall and report to Colonel Spickelmier's office daily when Mr. Lowery was permitted to check in via telephone, it is inconceivable that the Colonel's directive could constitute an adverse employment action in light of the fact that all three division chiefs were required to check in daily and both division chiefs at Fort Leavenworth were required to physically report to the Colonel's office. Lastly, no colorable argument can be made that Colonel Spickelmier's decision to send the support form through the interoffice mail as opposed to hand-delivering the form to plaintiff amounts to an adverse action, even if it could be liberally construed as an inconvenience to plaintiff.

In summary, then, the individual instances of alleged retaliation and discrimination highlighted by plaintiff do not constitute adverse employment actions for purposes of Title VII liability. Moreover, even after carefully considering the totality of Colonel Spickelmier's actions together, the court cannot conclude that the aggregate effect was a pattern of retaliatory or racial harassment, for the events considered together do not rise to the level of an adverse employment action. In fact, the Tenth Circuit has repeatedly rejected harassment claims based on facts that are much more egregious than those set forth by plaintiff here. For example, in *Amro v. Boeing Co.,* 232 F.3d 790 (10th Cir.2000), the Circuit rejected a retaliation claim based on a supervisor's alleged retaliatory harassment of the plaintiff because the plaintiff failed to demonstrate that his supervisor's conduct amounted to an adverse employment action. *See id.* at 799. In that case, the plaintiff alleged that his supervisor, after attending a meeting in which the plaintiff advised his supervisor that he thought he was discriminating against him, called him a "fucking foreigner;" placed his hands around the plaintiff's neck and patted him down, apparently to ascertain whether the plaintiff had a tape recorder; threw drawing papers at the plaintiff, causing a paper cut on plaintiff's neck; demanded to search through a folder that the plaintiff was carrying; and, on two other occasions, spoke unpleasantly to the plaintiff. *See id.* at 795. According to the Circuit, the "unpleasant and vulgar" encounters that the plaintiff had with his supervisor were simply not "sufficiently negative and pervasive to create an adverse employment action." *See id.* at 798.

Similarly, in *Heno v. Sprint/United Management Co.,* 208 F.3d 847 (10th Cir. 2000), the Circuit rejected the plaintiff's "retaliatory harassment" claim where the plaintiff failed to demonstrate that her supervisor's conduct amounted to an adverse employment action. *See id.* at 857–58. There, the plaintiff showed that her desk was moved to a different location; her telephone calls were monitored; her supervisor and coworkers acted in a "chilly" manner towards her, which made her feel isolated; the human resources department refused to further investigate her complaint once they found out she filed an EEOC complaint; and her supervisor suggested that she might wish to transfer to another department because her depart-

ment was shifting to a commission format in which the plaintiff had previously struggled. *See id.* at 857. Affirming the district court's grant of summary judgment, the Circuit stated:

These facts do not rise to the level of an adverse employment action. "Retaliatory conduct other than discharge or refusal to hire is ... proscribed by Title VII only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' or 'adversely affect[s] his [or her] status as an employee.'" Ms. Heno was working in the same job, for the same pay, with the same benefits. Moving her desk, monitoring her calls, being "chilly" towards her, and suggesting that she might do better in a different department simply did not affect Ms. Heno's employment status.

*See id.* (alterations in original) (citation omitted).

In *Sanchez v. Denver Public Schools,* 164 F.3d 527 (10th Cir.1998), the Circuit again affirmed the district court's grant of summary judgment to the defendant on the plaintiff's "retaliatory harassment" claim where the plaintiff failed to demonstrate that her supervisor's conduct amounted to an adverse employment action. *See id.* at 533. The plaintiff in *Sanchez* alleged that her supervisor, in retaliation for plaintiff's filing an EEOC complaint, made several ageist remarks; required her (but no one else) to bring a doctor's note when she was sick; threatened to write her up for insubordination; and threatened to put her on a plan for improvement. *See id.* Analyzing these allegations, the Circuit stated:

This conduct simply does not rise to the level of a materially adverse employment action sufficient to satisfy the second prong of the prima facie case. Courts considering the issue have held that " 'unsubstantiated oral reprimands'

and 'unnecessary derogatory comments' " such as those alleged here are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status.

.... It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for "otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"

*See id.* (citations and quotations omitted).

Unlike the factual contexts of *Amro, Heno* and *Sanchez,* here there is virtually no evidence that Colonel Spickelmier was unpleasant or vulgar to plaintiff. There is no evidence that Colonel Spickelmier made demeaning or derogatory comments to plaintiff or about plaintiff. Rather, the vast majority of plaintiff's complaints stem from disagreements with the way in which Colonel Spickelmier exercised his authority with respect to the business of RDD. Moreover, plaintiff does not allege that his actions were unduly monitored or that anyone was "chilly" or unpleasant to him. Colonel Spickelmier never suggested that plaintiff might do better elsewhere and he continued to give plaintiff exemplary performance reviews. There is no evidence that the Colonel required plaintiff to do things that other division chiefs were not required to do or that he treated the other division chiefs better than he treated plaintiff. Plaintiff has failed to demonstrate that Colonel Spickelmier's conduct altered his employment in any way. In the absence of such evidence, the court cannot conclude that Colonel Spickelmier's conduct was severe or pervasive enough to constitute an adverse employment action. Thus, because plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that he

suffered an adverse employment action, summary judgment in favor of defendant is appropriate.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to dismiss or, in the alternative, for summary judgment (doc. # 35) is **granted.** Plaintiff's complaint against defendant is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**