Marsha POWERS, Plaintiff,

v.

TWECO PRODUCTS, INC., Defendant.

No. CIV.A.00–1136–MLB.

United States District Court, D. Kansas.

June 5, 2002.

Paul S. McCausland, Young, Bogle, McCausland, Wells & Blanchard, PA, Wichita, KS, for Plaintiff.

Mikel L. Stout, Jay M. Rector, Boyd A. Byers, Foulston & Siefkin L.L.P., Wichita, KS, for Defendant.

## *MEMORANDUM AND ORDER*

BELOT, District Judge.

### *I. INTRODUCTION*

Plaintiff filed this suit against Tweco Products, Incorporated (Tweco), alleging Tweco violated federal anti-discrimination laws. Docs. 1 and 35. Specifically, plaintiff claimed that Tweco demoted her and retaliated against her in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et al.* This matter is currently before the court upon Tweco's motion for summary judgment. Doc. 44.[1] Finding jurisdiction proper, 28 U.S.C. § 1331, the court GRANTS Tweco's motion.

### A. Summary Judgment Standard: FED. R. CIV. P. 56

Before addressing the issues presented by the parties, it is important to put into perspective the scope of this court's inquiry on summary judgment. The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

---

1. In addition to Tweco's motion, the parties have filed and the court has considered (1) Tweco's memorandum in support of its motion, (2) Tweco's attachments in support of its motion, (3) plaintiff's response to Tweco's motion, and (4) Tweco's reply to plaintiff's response. Docs. 45, 46, 60, and 66. Counsel are to be complimented on the quality of their submissions.

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002). An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citations omitted); *see also Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler*). The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment because the factual dispute must be *material. See Schwartz v. Brotherhood of Maintenance of Way Employees*, 264 F.3d 1181, 1183 (10th Cir.2001); *see also Saucier v. Katz*, 533 U.S. 194, 212 n. 3, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (Ginsburg, J., concurring) (dismissing an allegation of fact that was disputed but irrelevant). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1146 (10th Cir.2001) (quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### 1. Moving Party's Burden

Tweco must initially show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law. *See Adler*, 144 F.3d at 670. Tweco need not "support its motion with affidavits or other similar materials *negating* [plaintiff's]" claims or defenses. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (emphasis in original). Rather, Tweco can satisfy its obligation simply by pointing out the absence of evidence on an essential element of plaintiff's claim. *See Sports Unlimited, Inc.*, 275 F.3d at 999; *Adler*, 144 F.3d at 671 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).

### 2. Non-Moving Party's Burden

If Tweco properly supports its motion, the burden shifts to plaintiff, who may not rest upon the mere allegation or denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial. *See Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir.1993). In setting forward these specific facts, plaintiff must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir.1994). Plaintiff cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial. *See Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988). Put simply, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### 3. Presentation of Evidence

 Certain local rules further govern the presentation of facts and evidence.

Local Rule 56.1 requires Tweco to set forth a concise statement of material facts. D. KAN. R. 56.1. Each fact must appear in a separately numbered paragraph and each paragraph must refer with particularity to the portion of the record upon which Tweco relies. *See id.* The opposing memorandum must contain a similar statement of facts. Plaintiff must number each fact in dispute, refer with particularity to those portions of the record upon which she relies and, if applicable, state the number of the Tweco's fact that she disputes. The court may, *but is not obligated to,* search for and consider evidence in the record that would rebut the Tweco's evidence, but that plaintiff has failed to cite. *See Mitchell v. City of Moore,* 218 F.3d 1190, 1199 (10th Cir.2000); *Adler,* 144 F.3d at 672. All material facts set forth are deemed to be admitted for the purpose of summary judgment unless specifically controverted. *See Gullickson v. Southwest Airlines Pilots' Ass'n,* 87 F.3d 1176, 1183 (10th Cir. 1996) (applying the local rules of the District of Utah). A standing order of this court also precludes drawing inferences or making arguments within the statement of facts.

■■■ The parties need not present evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible. *See Thomas v. International Bus. Mach's.,* 48 F.3d 478, 485 (10th Cir.1995) (internal quotations and citations omitted). For example, hearsay testimony that would be inadmissible at trial may not be included. *See Adams,* 233 F.3d at 1246. Similarly, the court will disregard conclusory statements and statements not based on personal knowledge. *See Cole v. Ruidoso Mun. Schs.,* 43 F.3d 1373, 1382 (10th Cir.1994) (regarding conclusory statements); *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir.1995) (requiring personal knowledge). Finally, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e). *See* FED. R. CIV. P. 56(e); D. KAN. R. 56.1; 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722 (2d ed.1994) (footnotes omitted).

### 4. Summary

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If sufficient evidence exists on which a trier of fact could reasonably find for the plaintiff, summary judgment is inappropriate. *See Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

### B. Facts[2]

#### 1. The Parties

Plaintiff Marsha Powers is a forty-seven year old woman with a high school edu-

**2.** Nearly all of the facts relevant to this motion are uncontroverted. To the extent any fact is in dispute, this court will view such fact(s) in the light most favorable, along with all favorable inferences, to plaintiff. *See Hall v. United Parcel Serv.,* No. Civ. A. 992467–CM, 2000 WL 1114841, at *5 (D.Kan. July 31, 2000) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). Where

cation. Doc. 45, ¶1. Defendant Tweco Products, Inc. (Tweco) manufactures welding guns, cutting torches, and related components and accessories. Doc. 45, ¶2. Until November 1998, Tweco employed 375 people but due to layoffs, now employs only 225 employees. Doc. 45, ¶3. The number of employees in Assembly, the department in which Marsha Powers worked, has been cut from fifty-five to ten. Doc. 45, ¶3.

Plaintiff was hired by Tweco in 1974, laid off in 1975, and rehired in 1977. Doc. 45, ¶11; Doc. 60, ¶11. Plaintiff held the position of Assembler A, a job with duties that included building welding guns and sub-assemblies. Doc. 45, ¶12. Since 1986, Assembler A has been a Grade V job. Other than leads, this was the highest graded Assembly job at the time. Doc. 45, ¶12.

During plaintiff's twenty-plus years of service with Tweco, she was under the direction of several supervisors. Bob George was plaintiff's supervisor for several years until he left [Tweco] on September 18, 1998. Doc. 45, ¶5. When Bob George left Tweco, Dan Sinnett became plaintiff's supervisor. Doc. 4, ¶6. Ron Dakin is Tweco's vice president of manufacturing. Doc. 45, ¶7. Dan Sinnett reports, as did Bob George while he worked for Tweco, directly to Ron Dakin. Doc. 45, ¶7. Tom Drury, the former vice president of human resources of Tweco's parent company, Thermadyne, was responsible for "oversight of employee benefits programs and employment policies" of Tweco. Doc. 45, ¶8. It appears that Tweco provides ADA training to its managers and has in place policies regarding Equal Employment Opportunity, Harassment, Plant Rules and Regulations (discipline), FMLA and Short-term Disability Leave, and Disability Termination of Employment. Doc. 45, ¶10.

### 2. Creating the Grade VI Position

In late 1997, Tweco's management team, responding in part to criticism attributed to plaintiff, created a "Grade VI Technical Assembler" position. In the new "Grade VI" position, six Grade V employees were to be promoted based upon their ability to rotate to all the different Assembly areas. Doc. 45, ¶16. When the plan was unveiled, plaintiff, as well as several other long-time Grade V assemblers, were offended because only a few, not all, of the Grade V assemblers would have an opportunity for the promotion. Backed by the popular sentiment, plaintiff met with Bill Foster, one of Tweco's vice presidents, and "told him that people were mad about the plan and that with the plan 'he might as well gone out there and kicked every one of them in the teeth.'" Doc. 45, ¶16 (quoting Doc. 46, Deposition of Marsha Powers, pp. 76–79, 91).

The day after the plan was unveiled, Tweco, bowing to popular pressure, adopted a new plan. Under the revised Grade VI plan, any Assembler who could pass the Grade VI tests and was able to rotate through and work in all Assembly areas could become a Grade VI Assembler. Doc. 45, ¶18. To qualify as a "Grade VI," the Assembler had to rotate through all six of Tweco's assembly areas: A–1 line; A–2 line; Tables, TIG line, Arcair, and Specials. Doc. 45, 20. It is an essential function of the Grade VI Technical Assembler job that the employee have the training and skill to work in all areas of Assembly and be willing and able to work in any area when requested. Doc. 45, ¶21. The position of Grade VI Assembler was created to provide higher pay to those Assemblers

relevant, the factual disagreements between the parties will be noted.

who could do everything in the Assembly area. Doc. 45, ¶ 19.

In what can only be described as an ironic twist, plaintiff pressed for the creation of a Grade VI Assembler because she felt slighted by Tweco's accommodation of injured employees. Tweco had a long-standing practice of accommodating Assemblers with permanent medical restrictions by letting them retain their Grade V status and pay but allowing them to perform only the part(s) of the Grade V job within their medical restrictions. Doc. 45, ¶ 14. Plaintiff believed it was not fair to herself and the other unrestricted Grade V Assemblers that Grade V Assemblers with medical restrictions were accommodated in this way. Doc. 45, ¶ 15. Thus, plaintiff approved the creation of the Grade VI position because she wanted a scenario where any Assembler who could move to all Assembly areas, like her, "while some [other] people set [sic] here and do the same job," should get more money. She thought it was unfair that Assemblers who worked in only one area or did only part of the job were getting paid the same as those who could work in all the different areas. Doc. 45, ¶ 17. In fact, there were a number of Grade V assemblers who could not rotate and perform all jobs in the six assembly areas due to their medical restrictions. Doc. 45, ¶ 24. These employees were not promoted to the new Grade VI job because they could not rotate through and perform all essential functions of the job. Doc. 45, ¶ 24.

### 3. Plaintiff Becomes a Grade VI Assembler

On August 12, 1997, plaintiff signed a request to be trained for the Technical Assembler (Grade VI) position. Doc. 45, ¶ 22. The form stated that plaintiff agreed to and wanted to be placed in a rotation that would allow her to work in all assembly areas with the goal of being classified as a Grade VI employee. Doc. 45, ¶ 22. In order to be considered for a Grade VI position, plaintiff had to be able to perform all the functions within the six assembly areas and to have "tested out" on their technical requirements. Plaintiff wrote on the form that she "agree[d] to this as long as rotation is done in a *fair* manner." Doc. 45, ¶ 22 (emphasis in original). On February 16, 1997, plaintiff was promoted to the position of a Grade VI Technical Assembler. Doc. 45, ¶ 23.

### 4. Plaintiff's Injury, Medical Exam, and Restriction

In September of 1998, plaintiff reported that she was suffering pain in her forearms and elbows. Doc. 45, ¶ 25. Tweco referred her to Dr. Ronald Aronoff, a doctor with Wesley Medical Center's Occupational Health Services. Doc. 45, ¶ 25. Dr. Aronoff diagnosed plaintiff with bilateral epicondylitis, Doc. 45, ¶ 25, more commonly known as "tennis elbow," Doc. 60, p. 1. Plaintiff did not have any problems with Dr. Aronoff and did not ask to see a different doctor. Doc. 45, ¶ 25.

Dr. Aronoff placed plaintiff under temporary restrictions from September 15, 1998 to October 27, 1998. Doc. 45, ¶ 26. Under these temporary restrictions, plaintiff was unable to perform all of her Grade VI job obligations. Doc. 45, ¶ 26. Nonetheless, Tweco kept plaintiff at the Grade VI pay level and temporarily accommodated her by letting her do only those parts of the job that were within her restrictions, doing whatever she could in the Specials and Tables area. Doc. 45, ¶ 26. It appears that other Grade VI assemblers were also temporarily accommodated in a similar manner. Doc. 45, ¶ 27.

Dr. Aronoff released plaintiff to full duty on October 27, 1998. Doc. 45, ¶ 28. Dr. Aronoff's report states that "there is no

permanent or partial disability associated with this bilateral epicondylitis now or in the future." Doc. 45, ¶ 28. While the report did not contain restrictions, Dr. Aronoff told plaintiff to notify her supervisors that there were certain motions she should avoid, primarily twisting her wrists in a door knob motion. Doc. 60, ¶ 28. Specifically, Dr. Aronoff noted that plaintiff " ' . . . will tell her supervisors that it would be best for her to work in a position that does not stress the epicondyles as her current position was doing.' " Doc. 45, ¶ 28. This instruction was noted in Dr. Aronoff's Work Injury Follow–Up Report. Doc. 60, ¶ 28.

■ After receiving this report, Mike Nolen, Tweco's manager of Human relations called Dr. Aronoff and confirmed that plaintiff had no restrictions.[3] Doc. 45, ¶ 29. Dakin and Sinnett believed that because plaintiff had been given a full release without restrictions, she should go back into the rotation. Plaintiff, however, said she could not go back into the rotation because she had restrictions and problems doing the jobs. Doc. 45, ¶ 30. In fact, plaintiff told Sinnett that he needed to try to find another position for her that did

not aggravate the problems with her arms, elbows, shoulders, and neck. Doc. 45, ¶ 31; Doc. 60, ¶ 31. Plaintiff believed, based on her interpretation of Dr. Aronoff's recommendation, and told Tweco that she was unable to perform the required duties of *any* of the six Assembly areas. Doc. 45, ¶ 31 (citing Doc. 46, Deposition of Marsha Powers, p. 121, lns. 15–23).[4]

To further clarify plaintiff's situation, Sinnett met, on November 3, 1998, with plaintiff to discuss her work restrictions. Doc. 45, ¶ 32. Sinnett asked plaintiff what she thought she could do and plaintiff told him she could not do any "doorknob" twisting motions with her wrist and that it would take her two years to get better. Plaintiff said she could not perform all the assembly functions in any of the six assembly areas but that she could do some subassembly work in the Tables and Specials. Doc. 45, ¶ 32. The two discussed the various jobs and that the automatic lines were fast and repetitive. Doc. 45, ¶ 32. They agreed that plaintiff would work only in the Tables and Specials areas. Doc. 45, ¶ 32. Plaintiff did believe,

---

**3.** Plaintiff objects to this statement of fact, claiming that what Nolen told Dakin is inadmissible hearsay. Doc. 60, ¶ 29. As Tweco points out, however, the statement is not hearsay because it is not being offered to prove the truth of the matter asserted, i.e., plaintiff had no restrictions, but is instead offered to prove what Dakin was told, and thus believed, as to whether plaintiff had medical restrictions. Doc. 66, ¶ 29. Plaintiff's objection is overruled. FED. R. EVID. 801. In any event, Dr. Aronoff's letter, Doc. 46, Tab 28, specifically states that plaintiff has no disability. As noted, plaintiff has relied on Dr. Aronoff's letter for her "no restrictions" position. Doc. 60, ¶ 30.

**4.** Plaintiff objects to the statements of fact contained in ¶¶ 30 and 31 by asserting two separate yet equally unavailing rationales for controverting these allegations. First, plain-

tiff claims that she "did not have restrictions," and "could do her [Grade VI] job." Doc. 60, ¶ 30 (indicating Dr. Aronoff fully released her). This position is undermined by plaintiff's sworn deposition testimony and other admissions. Doc. 46, Deposition of Marsha Powers, p. 121, lns. 15–23; Doc. 60, ¶ 31 ("Admitted plaintiff could not do all of the tasks in some of the areas."). Plaintiff also contends that there were some tasks in all six of the assembly areas that she could perform. Doc. 60, ¶¶ 30 and 31. This allegation, even if true, does not mask the fact that plaintiff's sworn deposition testimony concedes there were duties in all six assembly areas that she could not perform. Doc. 46, Deposition of Marsha Powers, p. 121, lns. 15–23; Doc. 60, ¶ 31. As such, the allegations contained at Doc. 46, ¶¶ 30 and 31 are deemed admitted.

however, that she could do more. Doc. 60, ¶ 32. Sinnett prepared a memorandum to Dakin regarding this meeting and outlined his impressions based upon what plaintiff had told him. Doc. 45, ¶¶ 32 and 33 (citing Doc. 46, Deposition of Dan Sinnett, p. 115–118).

On December 4, 1998 Nolen and Sinnett met with plaintiff and informed her that Tweco had decided to accommodate her restrictions by letting her perform only the parts of the job that she thought she could do. Doc. 45, ¶ 35. Because she was not able to perform all job functions in all six assembly areas, however, Nolen and Sinnett also informed her that she would be reduced from a Grade VI to a Grade V level and placed in the Tables area.[5] Doc. 45, ¶ 35. Plaintiff felt this accommodation was "unfair and unjust," but Sinnett explained that all Grade VI Assemblers are required to be able to perform all aspects of the job. Doc. 45, ¶ 35. Moreover, Sinnett explained that once plaintiff felt that she was capable of performing the duties of a Grade VI assembler, she would be moved back into that position. Doc. 45, ¶ 35.[6] Effective December 7, 1998, plaintiff was reduced from a Grade VI to a Grade V. Doc. 45, ¶ 36. She had been paid as a Grade VI from September 15, 1998, the time she began performing only part of the job requirements, until December 7, 1998. Doc. 45, ¶ 38.

### 5. Plaintiff's KHRC Charge

On February 19, 1999, plaintiff filed a charge with the Kansas Human Rights Commission, alleging her December 1998 grade reduction was in retaliation for internally reporting gender discrimination of other employees and for her having a disability. Doc. 45, ¶ 41. Though the "intake person" at KHRC told her she had a very good claim, Doc. 60, ¶ 92, KHRC issued a No Probable Cause determination, Doc. 45, ¶ 42. The Equal Employment Opportunity Commission adopted the KHRC's findings. Doc. 45, ¶ 42.

### 6. Incidents Surrounding Plaintiff and Kaye Perez

Kaye Perez was one of Tweco's Grade V assemblers with permanent medical restrictions that limited her ability to perform some portions of her job. Doc. 45, ¶ 44. On February 23, 1999, plaintiff became upset when her lead told her to work on FC welding guns. Plaintiff was upset because she thought Perez was getting out of this job just because she did not want to do it, not because she could not do it. Doc. 45, ¶ 45.[7] Though plaintiff was unaware of the extent of Perez's restrictions, she became upset and told her lead, Kathy Dickey, that she was tired of doing Perez's job. Doc. 45, ¶ 45. While plaintiff did not cause a large scene, other workers in the area heard plaintiff's complaint and plain-

---

**5.** Tweco alleges that in the Grade V position, plaintiff was allowed to perform only those assembly functions she believed she could perform. Doc. 45, ¶ 37. Plaintiff does not dispute this contention. Doc. 60, ¶ 37 (referring to another employee but failing to dispute the fact that she was not required to do all functions in the Grade V positions).

**6.** According to the uncontroverted facts, there were other employees at Grade V status because their medical limitations kept them from working in all areas. Doc. 45, ¶ 35.

**7.** Plaintiff has failed to either admit or deny the allegations contained in ¶ 45. Doc. 60, pp. 3, 5. As such, the allegations contained in this paragraph, which the court has verified are supported in the record, are deemed admitted. *See* D. Kan. R. 56.1(b)(1); *Gullickson v. Southwest Airlines Pilots' Ass'n*, 87 F.3d 1176, 1183 (10th Cir.1996) (applying the local rules of the District of Utah).

tiff was aware that others knew what she was discussing with Dickey. Doc. 45, ¶ 45.

The next day, February 24, 1999, Perez complained to Sinnett that plaintiff was harassing her because of her medical restrictions. Doc. 45, ¶ 46. Perez told Sinnett that she was tired of plaintiff's harassment and that she was thinking about going to a lawyer to get it resolved. Doc. 45, ¶ 46. Sinnett then met with Dickey, plaintiff's "lead," to discuss the matter. Doc. 45, ¶ 46. Dickey said that plaintiff had been very loud and irritated with her because of the fact that Perez did not assemble a certain part and sarcastically asked if Perez was getting out of this work because of her disability. Doc. 45, ¶ 46. Apparently, plaintiff's complaint to Dickey was not the first time she had lost patience with Perez—she had earlier complained to Sinnett about Tweco's accommodation of Perez and other employees with permanent medical restrictions. Doc. 45, ¶ 46 (noting that plaintiff believed Perez was "faking" her injury and trying to "take advantage" of Tweco).

Sinnett later informed Dakin and the Human Resources department about Perez's complaint. Doc. 45, ¶ 46. Dakin met with Perez and Perez repeated her complaint that she was being harassed by plaintiff. Doc. 45, ¶ 46. Because the new Human Resources manager, Kerry Unrein, had just started that job, Dakin and Sinnett investigated the harassment complaint themselves. Doc. 45, ¶ 47. Based upon their investigation, no evidence was found indicating that plaintiff made the complaints directly to Perez but there was evidence that plaintiff's "noisy" complaint was inappropriate. Doc. 45, ¶ 47; Doc. 60, ¶ 47; Doc. 66, ¶ 47. Dakin and Sinnett reported the results of their investigation to Unrein. Doc. 45, ¶ 48. They all agreed that a written warning was the appropriate discipline because of the severity of the issue. Doc. 45, ¶ 48. Plaintiff, however, disputes that a written warning was appropriate. Doc. 60, ¶ 48

Sinnett, Dakin, and Unrein met with plaintiff on February 25, 1999 and issued her a written warning for harassment. Doc. 45, ¶ 49. Attached to the written warning was a memo that stated " 'Verbally abusing other employees, either towards them or another person . . . will not be tolerated. . . . We are telling you that anymore incidents like these will result in you[r] immediate termination from Tweco Products, Inc. . . . We are committed to providing a working environment totally free of harassment.' " Doc. 45, ¶ 49. In addition to giving plaintiff this warning and memo, Dakin told plaintiff that it was not Tweco's intent to fire her. Doc. 45, ¶ 50. Rather, Dakin told plaintiff that Tweco wanted to advise her of Perez's complaint and to prevent such incidences from occurring in the future. Doc. 45, ¶ 50. Plaintiff said she did not believe Dakin and became upset and shouted that the company could get their lawyers together because she had a lawyer, and the company had better be ready to defend itself in court, because they had "opened up a can of worms." Doc. 45, ¶ 50. Plaintiff left the office, slammed the door as she walked out, returned, seconds later, and said that she was taking the rest of the day off. Doc. 45, ¶ 50.

### 7. Plaintiff's Absence

After leaving the February 25, 1999 meeting, plaintiff called Tweco and requested vacation for the next day because she was "too upset." Doc. 45, ¶¶ 50 and 55. Plaintiff called Tweco the next Monday and Tuesday (March 1 and 2, 1999) and left messages that she would not come into work on those days. Doc. 45, ¶ 56. On March 3, 1999, plaintiff called Sinnett and said she was still too upset to come to

work and that she was not up to being asked by other employees about her situation with the company. Doc. 45, ¶ 56. Sinnett asked whether she would be coming into work for the rest of the week, and told her that he needed to know if she wanted to take vacation time for the rest of the week. Doc. 45, ¶ 56. Plaintiff said she did not know when she would be coming into work. Doc. 45, ¶ 56.

On March 4, 1999, Sinnett called plaintiff and told her that if she wanted to cover her absence with vacation, company policy required that she ask him in advance and have it approved. He advised that because she had not done that, if she did not report to work the next day or get an approved leave of absence she could be subject to possible discharge. Doc. 45, ¶ 56. Plaintiff notified Sinnett, apparently for the first time, that she had a "doctor's excuse" for the time off. Doc. 45, ¶ 56. Sinnett then informed plaintiff that she needed to provide medical documentation to Michelle Birdwell, Tweco's human resources person at the time, to obtain a leave of absence. Doc. 45, ¶ 56. Plaintiff said something to the effect of "just fire me" or "just terminate me" twice and then hung up. Doc. 45, ¶ 56. A few days later, plaintiff obtained a doctor's statement to excuse her from work. Doc. 45, ¶ 59.

On April 5, 1999, Birdwell sent plaintiff an FMLA certification form. Doc. 45, 62. Because plaintiff had not returned the form by April 23, 1999, Birdwell sent her a letter stating that because she had not returned the form within 15 days, as required by the FMLA and company policy, Tweco was under no obligation to grant her leave; however, Tweco would nevertheless give her an additional ten days to provide medical certification. Doc. 45, ¶ 62. Plaintiff returned the certification on April 29, 1999. Doc. 45, ¶ 62.

Birdwell sent a letter dated June 14, 1999 to plaintiff stating that her FMLA leave would end on June 16, 1999 and that she would need to provide additional documentation if she did not return to work on June 17, 1999. Doc. 45, ¶ 64. Plaintiff provided the requested medical information on June 28, 1999 and Tweco extended her approved absence. Doc. 45, ¶ 65.

### 8. Plaintiff's Use of Tweco's Disability Policies

Under Tweco's Disability Termination of Employment policy, an employee who is absent due to medical disability for six consecutive months is terminated. Doc. 45, ¶ 66. Tweco employees who were off work pursuant to this policy were typically on either workers' compensation or short-term disability. Doc. 45, ¶ 67. This essentially guaranteed their pay and benefits would continue. Doc. 45, ¶ 67. Because Tweco's insurance provider had denied plaintiff's short-term disability claim, however, she did not qualify for this protection. Doc. 45, ¶ 67. Thus, after plaintiff's FMLA leave was exhausted, Tweco discontinued her benefits and sent her a COBRA notice. However, even though she was not on workers compensation or short-term disability, Tweco nevertheless decided to extend her leave to six months after her FMLA leave expired. Doc. 45, ¶ 67.

On June 30, 1999, Birdwell once again sent a letter to plaintiff, this time advising her that her FMLA benefits had been exhausted, effective June 16, 1999, and that she no longer had an automatic right of reinstatement. Doc. 45, ¶ 68. Birdwell also advised plaintiff that because she was still off work and her workers' compensation/short-term disability claims had been denied, she did not fit into any classification that provided fringe benefits and therefore needed to look to COBRA for benefits. Doc. 45, ¶ 68. Finally, Bird-

well's letter reminded plaintiff that under Tweco policy, an employee who has been off work for a continuing disability for six months is removed from the workforce. Doc. 45, ¶ 68. Plaintiff had been off work since February 25, 1999. Doc. 45, ¶ 68.

### 8. Plaintiff's Second KHRC Charge

On July 12, 1999, plaintiff filed a second charge with the Kansas Human Rights Commission. Doc. 45, ¶ 71. Plaintiff claimed that the February 25, 1999 written warning was in retaliation for her prior KHRC charge. Doc. 45, ¶ 71. She professed her belief that Tweco was looking for a reason to terminate her because of the discrimination charge. Doc. 45, ¶ 71. The KHRC dismissed plaintiff's complaint on May 8, 2000 and the EEOC terminated its processing of the charge on June 20, 2000. Doc. 45, ¶ 72.

### 9. Plaintiff and Tweco Go Separate Ways

On August 2, 1999, plaintiff informed Tweco that she had a doctors appointment in two days and did not know when she would be released to work. Doc. 45, ¶ 73. A little over three weeks later, on August 26, 1999, Birdwell sent a letter to plaintiff stating that she was being terminated for failure to return from six months leave. Doc. 45, ¶ 75. Drury, the vice president of Tweco's parent company's human resources department, and Birdwell were the persons involved in the decision to issue the termination notice. Doc. 45, ¶ 76. Although Sinnett had to sign the termination notice, neither he nor Dakin were involved in making this decision. Doc. 45, ¶ 76. The decision to terminate plaintiff was not motivated in any way by the fact plaintiff

had filed charges with the KHRC. Instead, plaintiff was terminated because she had exhausted her leave and did not return to work after six months. Doc. 45, ¶ 76.[8]

### C. Defining Plaintiff's Claims

As mentioned at the outset, plaintiff alleges that Tweco discriminated against her and retaliated against her in violation of the American's with Disabilities Act (ADA). As to the discrimination claim, plaintiff alleges that Tweco violated the ADA by demoting her from Grade VI to Grade V and that Tweco should have accommodated her "restrictions" by keeping her as a Grade VI but letting her perform only those parts of the job she though she could do. Doc. 45, ¶¶ 81 and 82. Plaintiff further believes that Tweco retaliated against her on February 25, 1999 and thereafter. Doc. 45, ¶ 88. Plaintiff originally identified four instances of retaliatory actions, Doc. 45, ¶ 89, but has since limited her retaliation claim to Tweco's issuance of a written warning that threatened termination if she ever harassed a coworker in the future, Doc. 60, p. 18–19.

## II. ANALYSIS

### A. ADA Discrimination

#### 1. Legal Framework

The Americans with Disability Act (ADA), 42 U.S.C. § 12101 *et seq.* provides that "[no] covered entity[9] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to [the] . . . discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Plaintiff claims that Tweco violated the ADA by demoting her

---

**8.** In fact, plaintiff agrees that the reason she was discharged was her failure to return to work from six months leave, in violation of company policy. Doc. 45, ¶ 77.

**9.** There is no dispute that Tweco is a covered entity. *See* 42 U.S.C. § 12111(2) and (5)(A).

to a Grade V assembler from the position of Grade VI assembler. Tweco argues, however, that plaintiff has failed to establish that she is a "qualified individual with a disability." Doc. 45, p. 20–22.

 As the term is used in section 12112, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential function of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The "back-and-forth" burden-shifting test first enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies when analyzing ADA claims at this summary judgment stage. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). Thus, to establish a prima facie claim under the ADA, plaintiff must show that: (1) she is a disabled person within the meaning of the ADA; (2) she is qualified, i.e., able to perform the essential functions of the job, with or without reasonable accommodation (which she must describe); and (3) Tweco discriminated against her in its employment decision to demote her from a Grade VI to a Grade V because of her alleged disability. *See Pack v. Kmart Corp.*, 166 F.3d 1300, 1304 (10th Cir.1999). If plaintiff produces evidence sufficient to meet her prima facie burden, the burden of production shifts to Tweco to present evidence that its reason for demoting plaintiff was not pretext for disability discrimination. *See Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1259 (10th Cir.2001) (analyzing an ADA discrimination claim). Next, if Tweco discharges this burden, "the burden reverts to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief.'" *Morgan*, 108

F.3d at 1323. At all times during this "ping-pong" exchange, however, "plaintiff retains the ultimate burden of proving such discrimination." *Selenke*, 248 F.3d at 1259.

### 2. Plaintiff's Prima Facie Case

#### a. Plaintiff Is Not "Disabled"

Under the first prong of plaintiff's prima facie case, plaintiff must show that she is "disabled" as that term is used in the ADA. *See Pack*, 166 F.3d at 1304. "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff contends only that she is disabled within the meaning of subparagraph (C)—being regarded as having such an impairment. Doc. 60, p. 12.

 "There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1241 (10th Cir.2001); *but see Steele v. Thiokol Corp.*, 241 F.3d 1248, 1256 (10th Cir.2001) (citing the three scenarios under which a plaintiff may be deemed disabled as set forth by the EEOC in 29 C.F.R. § 1630.2(1)). In both situations, plaintiff must demonstrate that Tweco entertained misperceptions about her abilities, either that she had a substantially limiting impairment that she did not have or that she had a substantial-

ly limiting impairment that, in fact, was not so limiting. *See Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 499 (10th Cir. 2000) (quoting *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139). These misperceptions are often the result of stereotypic assumptions that are not truly indicative of plaintiff's ability. *See Sutton,* 527 U.S. at 489, 119 S.Ct. 2139. The focus of this inquiry is upon the alleged impairment's effect upon the attitudes of others. *See Gaddy v. Four B Corp.*, 953 F.Supp. 331, 338 (D.Kan.1997).

 Based upon a review of the aforementioned facts in light of existing law within the Tenth Circuit, the court concludes that Tweco did not regard plaintiff as being disabled as that term is used in the ADA. Several courts, including the Tenth Circuit and district courts within Kansas, have recognized that an employer's simple recognition of one of its employee's limitations is not unlawful. *See Lusk v. Ryder Integrated Logistics,* noted that 238 F.3d 1237, 1241–42 (10th Cir.2001) ("Where the recognition of Plaintiff's limitations is not an erroneous perception, but is instead a recognition of fact, a finding that Plaintiff was regarded as disabled is inappropriate."); *Gaddy v. Four B Corp.*, 953 F.Supp. 331, 338 (D.Kan.1997) (granting summary judgment in a "regarded as" claim where the defendant's actions were premised upon *plaintiff's* "self-imposed" restrictions). Rather, what makes the "perception" unlawful is if the belief is preconceived or unfounded. *See Sorensen v. University of Utah Hosp.*, 194 F.3d 1084, 1088 (10th Cir.1999) (quoting *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139).

Here, Tweco did not make any "unfounded" or "preconceived" assumptions about plaintiff's ability. Rather, the undisputed evidence demonstrates that Tweco, after being informed by plaintiff that Dr. Aronoff's report, which noted that plaintiff had no limitations, was misleading, engaged in an in-depth discussion with plaintiff regarding her abilities and what tasks she felt able or comfortable in performing. After the parties conferred, Tweco simply set forth a plan to accommodate plaintiff's desires. This is not unlawful under the ADA. *See Gaddy v. Four B Corp.*, 953 F.Supp. 331, 338 (D.Kan.1997) ("If courts were to interpret the ADA to hold otherwise, employers would be discouraged from attempting to work with people who, though not actually disabled, feel themselves in need of some special treatment from their employer to help them obtain or keep their jobs."). Accordingly, the court finds that plaintiff has failed to produce evidence that would permit a jury to conclude that Tweco regarded plaintiff as disabled.

b. Plaintiff Was Not Qualified To Be A Grade VI Assembler

 Even assuming plaintiff was "regarded as" being disabled, the uncontroverted evidence shows that plaintiff was not "qualified" to perform the essential job functions of a Grade VI assembler. In the Tenth Circuit, there is a two-part test for determining whether the person is "qualified" under the ADA. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir.1999). First, this court must examine whether a plaintiff can perform the essential functions of the Grade VI assembler job,[10] "i.e., functions that bear more

---

**10.** There is no doubt that the Grade VI assembler position is the proper job this court must analyze to determine whether plaintiff is "qualified." In *Anderson,* the Tenth Circuit specifically rejected the notion that the "qual-

ified" analysis should be undertaken with respect to an accommodated or adjusted job description. *See* 181 F.3d at 1176. Rather, the court held that the proper inquiry focuses upon the actual job plaintiff was performing.

than a marginal relationship to the job at issue." *See Anderson,* 181 F.3d at 1175. If (but only if) plaintiff cannot perform the essential functions of the Grade VI assembler, the next step is to determine whether any reasonable accommodation by Tweco would enable her to perform that job. *See Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174 (10th Cir.1996).

■ In light of the uncontroverted facts, there is no doubt that plaintiff was not "qualified" to be a Grade VI assembler. To begin with, a Grade VI assembler was required to perform *all* tasks in *all* six assembly areas. Indeed, this was the prerequisite to becoming a Grade VI assembler and the motivating force for creating, at plaintiff's behest, this position. Plaintiff has produced no evidence that would suggest this requirement does not serve a legitimate business purpose. *See White v. York Int'l Corp.,* 45 F.3d 357, 362 (10th Cir.1995) (accepting the job requirements as "essential functions" because plaintiff could not establish that they could not be eliminated without fundamentally altering the nature of the job). Moreover, as noted above, plaintiff admittedly could not perform every the function in each of the six assembly areas. Doc. 45, ¶ 32. As such, plaintiff is not "qualified" under the ADA unless she could have performed the Grade VI job with a reasonable accommodation. *See Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174 (10th Cir. 1996) (stating the court must next look to whether any reasonable accommodation would have enabled plaintiff to perform the job function).

■ Tweco argues that this court should not consider whether any accommodation, reasonable or otherwise, would permit plaintiff to perform the Grade VI duties because she is admittedly not disabled but only contends Tweco considered her to be infirm. Doc. 66, p. 7–8. In support of this position, Tweco cites *Gilday v. Mecosta County,* 124 F.3d 760, 764 n. 4 (6th Cir.1997) and a decision from this court, *Bernard v. Doskocil Co., Inc.,* 861 F.Supp. 1006, 1013 (D.Kan.1994). While common sense would indicate Tweco's position is sound, these cases, despite their facial strength, are not necessarily Tweco's silver bullet. For example, the Sixth Circuit's footnote in *Gilday* is, at best, dicta. *See* 124 F.3d at 763–64 (opining, in a footnote to a hypothetical discussion, that a "person without an actual disability would not need an accommodation"). Furthermore, in *Bernard,* this court merely recognized the incredulity that a plaintiff would face from a jury if he were to argue that he was not really disabled but nonetheless needed an accommodation. *See* 861 F.Supp. at 1013 (reviewing plaintiff's state law discrimination claim). Thus, neither of these cases affirmatively hold that a plaintiff who claims not to be disabled but only that she was considered disabled is not entitled to an accommodation. *Cf. Alexander v. Sandoval,* 532 U.S. 275, 282, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (stating "this Court is bound by holdings, not language"); *see also Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources,* 532 U.S. 598, 621, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (Scalia, J., concurring) (declining to follow the Court's prior misleading dicta); *Atwater v. City of Lago Vista,* 532 U.S. 318, 340, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (discounting an "isolated sentence"); *Woodward v. City of Worland,* 977 F.2d 1392, 1399 (10th Cir.1992).

■ Though this court has neither located nor has it been alerted to any au-

*See id.* Thus, this court looks to whether plaintiff was "qualified" to be a Grade VI

assembler.

thority holding that an individual who is not physically or mentally disabled (only "regarded as") cannot seek the benefit of having her qualification determined in light of any accommodation, several reasons support such a rule. To begin with, common sense, if nothing else, would preclude plaintiff from claiming that she was not "disabled" but that she nonetheless was entitled to an accommodation for a nonexistent disability. Moreover, while not controlling, the discussions and insights of *Gilday* and *Bernard* are certainly persuasive. Plaintiff, by conceding she was not disabled, has essentially waived any claim that Tweco was required to accommodate her. Therefore, the court holds that plaintiff, who is admittedly not disabled, is not entitled to any accommodation when determining whether she is "qualified." [11]

### c. Summary

Upon review of existing law and the evidence submitted by the parties, the court finds that plaintiff has failed to set forth a prima facie case of ADA discrimination. Specifically, plaintiff has failed to produce evidence that Tweco "regarded" her as being disabled. Moreover, plaintiff has failed to set forth any evidence that she was "qualified" to perform the Grade VI job. Accordingly, Tweco's motion for summary judgment as to plaintiff's ADA discrimination claim is GRANTED.

### B. ADA Retaliation

#### 1. *Legal Framework*

 Plaintiff also claims she was retaliated against in violation of the ADA,[12]

which, in relevant part, states that it "shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b). As with her ADA discrimination claims, the *McDonnell Douglas* framework guides the analysis of her claim at the summary judgment stage. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999). This familiar framework first requires plaintiff to establish the elements of her prima facie case, which include a showing that (1) she engaged in an activity protected by the statute, (2) she was subjected to an adverse employment action subsequent to or contemporaneous with the identified protected activity, and (3) there is a causal connection between this protected activity and the adverse employment action. *See Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1219 (D.Kan.2001) (citing *Anderson*). If plaintiff establishes a prima facie case, Tweco must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.2001). Assuming Tweco comes forward with such evidence, the burden returns to plaintiff to identify evidence which could lead a jury to conclude that Tweco's proffered reason was pretextual, or, in other words, unworthy of belief. *See Sink v. Wal–Mart Stores, Inc.*, 147

---

**11.** Even assuming this holding is in error, plaintiff has not produced evidence that there were any more reasonable accommodations that could have been made for her. Doc. 45, ¶¶ 39, 40. She was, after all, permitted to perform only those Grade V functions she believed she could perform. Doc. 45, ¶ 37.

**12.** Plaintiff need not be "disabled" to prosecute a claim for retaliation under the ADA. *Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.2001) (stating that plaintiff need only have a good faith belief the ADA has been violated).

F.Supp.2d 1085, 1096 (D.Kan.2001) (citing *Selenke* ).

### 2. Application

#### a. Prima Facie Case [13]

##### (1) Adverse Employment Action

 Plaintiff claims that, two days after Tweco received her initial KHRC complaint, Tweco placed a written warning in her employment file that "threatened" her with termination if she ever again verbally abused another coworker and that this act constituted an adverse employment action. Doc. 60, p. 18. The Tenth Circuit liberally defines the phrase "adverse employment action" but has not established a litmus test regarding what constitutes such an action. *See Anderson*, 181 F.3d at 1178. Obviously, decisions that significantly alter the employment status constitute an adverse employment action. *See, e.g., Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir.1998) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Less obvious actions may also constitute an adverse action and are judged on a "case-by-case" basis to determine whether an identified employment action is truly adverse. *See Sanchez*, 164 F.3d at 532 (noting adverse actions are not limited solely to monetary losses in the form of wages or benefits). While all circumstance are relevant to this inquiry, it is important to remember that the ADA is not a general civility code and neither does it make actionable the common workaday tribulations. *See Anderson*, 181 F.3d at 1178; *see also Sanchez*, 164 F.3d at 532

(stating that mere inconveniences or minor alterations in job responsibilities are not adverse employment actions).

Though neither party has identified any case specifically discussing written warnings, Tweco does note that several Tenth Circuit cases have held that negative work evaluations, even when reduced to writing, are not generally considered an adverse employment action. Doc. 45, p. 22–23 (citing *Amro v. Boeing Co.*, 232 F.3d 790, 799 (10th Cir.2000) and *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)). The exception to this rule regarding evaluations apparently arises when the negative evaluation is used as the basis to later discharge the employee. *See Toth v. Gates Rubber Co.*, 2000 WL 796068, at \*9, 216 F.3d 1088 (10th Cir.2000).

The court's independent research has also uncovered a similar distinction when it comes to written warnings. For example, Judge Lungstrum recently reviewed whether written reprimands constituted an adverse employment action. *See Young v. White*, 200 F.Supp.2d 1259, 1274–75 (D.Kan.2002). Because the plaintiff in *Young* produced no evidence that this reprimand had any effect on his employment and because plaintiff continued to receive "solid annual performance evaluations," the court held no jury could reasonably conclude that the written reprimand constituted an adverse employment action. *See id.* When there is evidence that the effects of the written warning make it more likely for termination, however, the Tenth Circuit has held that the written warning does sufficiently constitute an adverse employment action. *See Roberts v.*

---

**13.** Tweco apparently concedes plaintiff has produced evidence that she engaged in protected activity. Doc. 45, p. 22. In any event, the court finds that plaintiff has set forth evidence that on February 19, 1999 she filed a complaint with the KHRC claiming her grade reduction was based on her disability, Doc.

45, ¶ 41, and that this sufficiently satisfies the protected activity prong. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999) (holding the filing of an EEOC charge satisfies the protected activity requirement).

*Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir.1998).

Plaintiff's complaint does not fall neatly into either of these categories. Certainly, there is no evidence that Tweco ever took any action as a result of the written warning nor is it alleged that the written warning had any effect on her employment status. On the other hand, the threat of termination contained in the written warning appears, at least facially, very ominous. While not deciding the issue, the court will, for purposes of this Memorandum and Order, assume the written warning constituted an adverse employment action.

### (2) Causal Connection

■ Plaintiff next contends that she has established a causal connection because Tweco received her KHRC charge two days prior to their issuance of the written warning. Doc. 60, p. 19. A causal connection is shown where the evidence of circumstances justifies an inference of retaliatory motive. *See O'Neal v. Ferguson*, 237 F.3d 1248, 1253 (10th Cir.2001). For example, if protected conduct is closely followed by an adverse action, timing alone may justify such an inference. When considering timing, the Tenth Circuit has sketched rough guideposts such that a one and one-half month delay is sufficient for this inference to arise but a three month delay is not sufficient. *See Sink v. Wal–Mart Stores, Inc.*, 147 F.Supp.2d 1085, 1098 (D.Kan.2001) (reviewing *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994) and *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997)); *see also Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1219–20 (D.Kan.2001) (finding a two month separation was "close enough" to support such an inference). Without this close temporal relationship, a plaintiff must come forward with some additional evidence that would be indicative of a retaliatory motive. *See*

*O'Neal*, 237 F.3d at 1253 (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997)).

■ Because the warning occurred less than one week after the protected activity, Doc. 45, ¶¶ 41, 49, the knee-jerk reaction would be that plaintiff has satisfied her "causal connection" element. Nonetheless, Tweco notes, and plaintiff concedes, that Dakin and Sinnett were not aware of the KHRC charge when they investigated Perez's charges and issued the written warning. Doc. 45, ¶ 51; Doc. 60, ¶ 51. As Judge Crow, of this court, recently noted, "[e]vidence of the acting party's knowledge is essential to establishing a causal connection between the adverse action and the protected activity." *Hinson v. Molix*, 187 F.Supp.2d 1297, 1311 (D.Kan.2002) (citing *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993)). Indeed, without such knowledge, no inference of causation is possible. *Id.* Unrein, the only other Tweco employee who participated in the investigation and discipline of plaintiff, admittedly had knowledge of the complaint but there is uncontroverted evidence that this knowledge was not a factor that motivated his decision to issue the written warning. Doc. 45, ¶ 51; Doc. 60, ¶ 51. While the uncontroverted evidence establishes that the KHRC complaint was not the motivating factor behind either Dakin, Sinnett, or Unrein's decision to issue the written warning, the court, for purposes of this Memorandum and Order only, will assume that Tweco's receipt of the KHRC charge and Unrein's knowledge of the charge and his self-serving (though uncontroverted) declaration that this charge did not motivate his decision, is sufficient to at least raise the inference that Tweco's decision to issue the written warning was causally connected to plaintiff's KHRC complaint. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.2001) (recogniz-

ing the strength of inference of causation is roughly correlated to the acuteness of the temporal proximity); *see also Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir.1997) (assuming plaintiff satisfied the prima facie elements but concluding pretext had not been shown).

b. Legitimate, Nondiscriminatory Reason

■■■ The next step is to determine whether Tweco can produce evidence that it took the identified action for a legitimate, nondiscriminatory reason. Tweco contends, and has produced evidence, that it gave the written warning to plaintiff based upon an investigation into the Perez-plaintiff confrontation that occurred on February 23, 1999 and its concern for maintaining a harassment-free workplace. Doc. 45, ¶¶ 45–49. This sufficiently satisfies Tweco's burden to articulate a legitimate, nondiscriminatory reason for its action.

c. Evidence of Pretext

■■■ Having navigated through two of the three steps in the burden-shifting *McDonnell Douglas* analysis, the burden returns to plaintiff to come forward with evidence that Tweco's reason is "pretext" for discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1396 (10th Cir.1997). The Tenth Circuit has recognized that a plaintiff may show pretext by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its actions. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997). Such allegations, however, must contain more than a skeptical claim, as conjecture alone is insufficient to withstand summary judg-

ment. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999).

■■■ To support her pretext argument, plaintiff claims that (1) Tweco's reason for "the written warning -that plaintiff harassed Perez—'is patently false,'" (2) the level of discipline was not appropriate in light of Tweco's "progressive discipline policy," and (3) no other employee has been disciplined for similar behavior. Doc. 60, p. 21. Though plaintiff claims she never harassed Perez, there is uncontroverted evidence that Tweco received a complaint from Perez indicating that plaintiff had harassed her about her medical limitations and that Tweco's investigation, at least in the eyes of Dakin, Sinnett, and Unrein, supported Perez's version of events. Doc. 45, ¶¶ 45, 46, 47. Moreover, plaintiff's contention that she did not engage in harassing behavior simply because her comments were not directed at Perez, but to her lead, is, as a matter of law, insignificant. *See, e.g., Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415–16 (10th Cir.1987) (finding harassment directed at employees other than plaintiff may constitute a hostile work environment claim). In light of this evidence, the court cannot conclude that Tweco's proffered reason is false. Even if the decision were questionable, however, this court must examine the facts as they appeared to Sinnett, Dakin, and Unrein and cannot replace Tweco's business judgment with its own, hindsight-aided analysis. *See Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1266 (10th Cir.2001) (stating the defendant's perception, not plaintiff's subjective belief, is the critical pretext inquiry); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000) (assuming the question of whether triggering event occurred as defendant claimed would create a fact question but finding summary judgment was appropriate nonetheless because the "un-

disputed evidence", as it appeared to defendant, showed defendant terminated the plaintiff based upon this belief). Accordingly, even assuming plaintiff's version of the facts is true, she has not presented any evidence that Tweco's decision to issue the written warning was not based upon Perez's complaints.

Moreover, while plaintiff's prima facie case was certainly aided by the close temporal relationship between her protected conduct and the written reprimand, timing alone is insufficient to show pretext. *See Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1266 (10th Cir.2001). Timing is especially of marginal significance in light of the evidence that indicates plaintiff engaged in unacceptable behavior between the time she engaged in protected conduct and when plaintiff was issued the written warning. *See Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1221 (D.Kan.2001) (noting the Eight Circuit, in *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999), held that intervening unprotected conduct eroded any causal connection suggested by the temporal proximity between plaintiff's protected conduct and the adverse employment action).

 Plaintiff's next claims, that her conduct did not justify the level of discipline she was given and that no other employee was similarly sanctioned, also fail to give rise to the inference that Tweco's proffered reason is unworthy of belief. As noted in *Kendrick*, for apparently disparate discipline patterns to support an inference of pretext, a plaintiff must be able to identify other similarly situated employees who have violated work

rules of comparable seriousness. *See Kendrick*, 220 F.3d at 1230, 1232. Though plaintiff's discussion fails make these claims or point to the record for any such support, Doc. 60, p. 21, the court has reviewed the parties' respective allegations of fact, Doc. 45, ¶¶ 46–53; Doc. 60, ¶¶ 47, 48, 51, 52, 53,[14] but has not found any indication that a similarly situated employee engaged in behavior that arguably violated federal anti-harassment laws but was treated more favorably than plaintiff. Even assuming plaintiff could marshal such evidence, she has failed to produce any evidence that her discipline was precipitated by her protected activity or was otherwise contrary to Tweco's business judgment. *See Kendrick*, 220 F.3d at 1232 (noting that all human relationships are inherently complex and differential treatment alone is insignificant); *cf. also Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1221 (D.Kan.2001) (recognizing that engagement in protected activity does not prevent employer scrutiny for inappropriate conduct).

d. Summary

Though the court questions whether plaintiff has set forth evidence that a causal connection, as a matter of law, has been established, the court nonetheless has assumed plaintiff has set forth a prima facie case of ADA retaliation. Further, the court has found that Tweco has set forth a legitimate, nondiscriminatory reason for issuing plaintiff a written warning for her allegedly harassing conduct. Plaintiff's evidence, however, has failed to create a genuine dispute of fact with respect to whether Tweco's reason was merely pre-

---

**14.** In fact, there is evidence that other employees have been issued similar written warnings without prior verbal warnings for the harassment of other employees. Doc. 45, ¶ 53. Plaintiff objects to the inclusion of this fact because the documents relied upon by

Tweco were not produced in discovery. Doc. 60, ¶ 53. Even assuming the underlying documents are not considered, plaintiff has failed to contradict the information contained in the affidavit supporting this allegation of fact.

textual. Accordingly, the court GRANTS Tweco's motion for summary judgment with respect to plaintiff's ADA retaliation claim.

### C. Punitive Damages

Tweco also moves for summary judgment with respect to plaintiff's claim for punitive damages. Doc. 45, p. 25. Because summary judgment has been granted in favor of Tweco on plaintiff's two ADA claims, the court also GRANTS Tweco's motion for summary judgment as to plaintiff's claims for punitive damages.

### III. CONCLUSION

For the preceding reasons, the court GRANTS Tweco's motion for summary judgment.

A motion for reconsideration of this order is neither expected nor encouraged. Any such motion shall not exceed 5 double-spaced pages and shall strictly comply with the standards enunciated by this court in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 5 double-spaced pages. No reply shall be filed. Failure to adhere to these limitations will operate as a waiver to reconsideration.

IT IS SO ORDERED.